IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


ALISON GARY, an individual,                          No. 3:17-cv-01414-HZ

                    Plaintiff,

        v.

UNUM LIFE INSURANCE COMPANY                          OPINION & ORDER
OF AMERICA, a Maine corporation, as
administrator of the Dickstein Shapiro LLP
Group Long Term Disability Plan,

                    Defendant.

Arden J. Olson
HARRANG LONG GARY RUDNICK, PC
497 Oakway Road, Suite 380
Eugene, Oregon 97401

                    Attorney for Plaintiff

Robert B. Miller
KILMER, VOORHEES & LAURICK, PC
732 NW 19th Avenue
Portland, Oregon 97209

                    Attorney for Defendant

HERNÁNDEZ, District Judge:

Plaintiff Alison Gary brings three claims in this action under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001-1461 ("ERISA"), alleging that Defendant Unum Life Insurance Company of America wrongfully denied her application for long-term disability ("LTD") benefits under the LTD Plan entered into by Defendant and Plaintiff's former employer. Plaintiff contends that she is entitled to LTD benefits from April 6, 2015, to the date of judgment in this case.

The Court already ruled on the merits of Plaintiff's second claim, as explained below. Now, both parties move for summary judgment on Plaintiff's first and third claims. In addition, Plaintiff moves to strike portions of Defendant's supplemental materials from the Administrative Record. The Court grants Plaintiff's motion to strike but denies Plaintiff's motion for summary judgment. The Court grants Defendant's motion for summary judgment.

## BACKGROUND

### I.      Procedural Background

The Court summarized the background of this case in its March 12, 2018 Opinion & Order, as follows:

> In September 2012, Plaintiff became employed as an attorney at Dickstein Shapiro LLP. FAC ¶ 5. Dickstein Shapiro has a Group Long Term Disability Plan administered by Defendant. *Id.* ¶¶ 1, 2. Plaintiff asserts that she became totally disabled and that her physician ordered her to cease practicing law on November 27, 2013. *Id.* ¶ 5. She stopped practicing law the next business day, December 1, 2013, and alleges that she has been unable to practice law since that date. *Id.*
>
> On September 1, 2016, Plaintiff filed a claim for long-term disability (LTD) benefits with Defendant, seeking benefits since the November 27, 2013 disability onset date. Olson Nov. 30, 2017 Decl. ¶ 1, ECF 10. In seeking LTD benefits, Plaintiff noted that she "is, and was at all times from the beginning" of her eligibility, "disabled under the terms of the policy." Miller Jan. 5, 2018 Decl., Ex. 1 at 1, ECF 20-1. She asserted that she became disabled one year after she began working at Dickstein Shapiro, and "continues to remain unable to work as an attorney[.]" *Id.*, Ex. 1 at 2. She recited several facts about her

impairments and treatment from November 2013 through October 2016 and in conclusion asserted that she "is and has continuously since November 2013 been completely disabled under the terms of the LTD Plan." *Id.*, Ex. 1 at 5. She also included more than sixty pages of medical records. *Id.*, Ex. 1 at 6-69.

Defendant initially responded with a request for additional information and a one month payment of benefits under a reservation of rights. Olson Nov. 30, 2017 Decl. ¶ 3 & Ex. 1, ECF 10-1. Then, on February 24, 2017, Defendant sent a letter to Plaintiff denying her claim ("the February 24, 2017 decision letter" or "the Initial Denial"). *Id.* ¶ 4 & Ex. 2[1], ECF 10-2. In the section entitled "Decision/Reason," Defendant wrote: "We have determined your client was not disabled through the 180 day elimination period. Because [Plaintiff] was not disabled through this period, according to the policy, benefits are not payable." *Id.*, Ex. 2 at 1. Defendant's February 24, 2017 decision letter included two single-spaced pages under the heading "Information That Supports Our Decision," discussing the evidence Defendant reviewed in assessing Plaintiff's claim. *Id.*, Ex. 2 at 2-4. First, Defendant explained that the policy has a 180-day elimination period during which time the claimant must be continuously disabled in order to receive disability benefits. *Id.*, Ex. 2 at 2. In this case, the elimination period began on November 27, 2013 and ended May 25, 2014. *Id.* Next, Defendant cited to various medical records provided by Plaintiff. *Id.*, Ex. 2 at 2-4. Following that, Defendant provided relevant policy provisions for defining disability, the elimination period, and termination of coverage. *Id.*, Ex. 2 at 4-5. Finally, the February 24, 2017 decision letter included an explanation of Plaintiff's right to appeal, how to pursue an internal appeal, and if necessary, the right to file an ERISA action in court. *Id.*, Ex. 2 at 6-7.

Plaintiff filed her administrative appeal on June 8, 2017. Olson Nov. 30, 2017 Decl. ¶ 5. In support, she submitted a fifty-one page, mostly single-spaced letter, along with thirty-two exhibits totaling more than two hundred pages. Miller Jan. 5, 2018 Decl. ¶ 3 & Ex. 2, ECF 20-2.

Defendant responded to the appeal in a July 26, 2017 letter ("the Final Decision."). Olson Nov. 30, 2017 Decl. ¶ 6 & Ex. 3, ECF 10-3. The Final Decision explained Defendant's "Appeal Decision" as follows:

> On appeal, we have determined [Plaintiff] was disabled from Nov. 27, 2013, through April 6, 2015. We are approving LTD benefit payments for that period.
>
> After April 6, 2015, we have concluded [Plaintiff] was able to perform the duties of [her] regulation occupation and no longer met the definition of disability in the policies.

*Id.*, Ex. 3 at 2. The Final Decision included a several page, single-spaced section with information supporting Defendant's decision, followed by applicable policy provisions

---

[1] Defendant sent a second letter that same date to include a paragraph inadvertently omitted from the February 24, 2017 decision letter. Olson Nov. 30, 2017 Decl., Ex. 2 at 8.

including the definition of disability. *Id.*, Ex. 3 at 2-9. It also explained that if Plaintiff disagreed with the decision, she could file a civil ERISA suit. *Id.*, Ex. 3 at 10. No right to an internal review was mentioned. This lawsuit followed.

*Gary v. Unum Life Ins. Co. of Am.*, No. 3:17-CV-01414-HZ, 2018 WL 1309991 at *1-2 (D. Or. Mar. 12, 2018).

Plaintiff filed this action on September 8, 2017. Compl., ECF 1. She subsequently filed a First Amended Complaint ("FAC"), in which she brought three claims for relief. FAC, ECF 24. On March 12, 2018, this Court granted in part Plaintiff's motion for summary judgment on her second claim. *Gary,* 2018 WL 1309991 at *7. The Court held that the Final Decision articulated a new or different reason than the reason given in the Initial Denial and, therefore, violated Plaintiff's right to a "full and fair review" of the denial of her claim under 29 U.S.C. § 1133 and its implementing regulation, 29 C.F.R. § 2560.503-1. While the Court found that Defendant violated Plaintiff's right to a full and fair review, it denied Plaintiff's requested relief of ordering retroactive payment of LTD benefits from April 6, 2015 to the date of judgment in this case. *Id.* at *9. Instead, the Court held that the appropriate remedy was to allow Plaintiff to supplement the record. *Id.*

The parties subsequently engaged in motion practice regarding (1) Plaintiff's request to supplement the Administrative Record with medical records relevant to her condition from April 2015 to the present; and (2) her request the Court rule that a *de novo* standard of review applies. *See* Pl.'s Mot. Expand Record and Adopt De Novo Standard of Review, ECF 35. On September 6, 2018, the Court granted in part Plaintiff's motion to expand the Administrative Record by allowing Plaintiff to supplement the record with medical evidence in existence on or before January 22, 2018. Sept. 6, 2018 Opinion & Order, ECF 45 ("Sept. 6, 2018 Op."). The Court denied the motion to adopt a *de novo* standard of review. *Id.* The Court held that "an abuse of

discretion standard applies with the appropriate level of skepticism to be determined as part of the merits." *Id.* at 17.

On September 27, 2018, the Court held a telephone scheduling conference with the parties, in which the Court set a schedule for summary judgment briefing and supplementing the Administrative Record. On October 18, 2018, Plaintiff filed a supplemental record and on November 30, 2018, Defendant filed a supplemental record.

Now before the Court are the parties' cross-motions for summary judgment and Plaintiff's motion to strike Defendant's supplemental materials from the Administrative Record.

## II.    The Policy

The LTD Plan provides for a monthly disability income benefit after an initial 180-day elimination period. AR 388[1]. The Plan defines "disability" as:

> You are disabled when Unum determines that due to your sickness or injury:
>
> 1.  You are unable to perform the *material and substantial duties* of your *regular occupation* and are not working in your regular occupation or any other occupation or,
>
> 2.  You are unable to perform one or more of the material and substantial duties of your regular occupation, and you have a 20% or more loss in your *indexed monthly earnings* while working in your regular occupation or in any occupation.
>
> You must be under the regular care of a physician in order to be disabled.  The loss of a professional or occupational license or certification does not, in itself, constitute disability.

AR 401.

> Regular occupation means the occupation you are routinely performing when your disability begins. Unum will look at your occupation as it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location. For attorneys, "regular occupation" means your specialty in the practice of law which you are routinely performing when your disability begins.

---

[1] Citations to "AR" are to the Administrative Record, ECF 34, 49.

AR 426.

## III. Plaintiff's Medical History and Records

The Court provides background information on Plaintiff's medical conditions prior to April 6, 2015, as they are necessary to understand her conditions after that date. However, because there is no dispute as to Plaintiff's disability between November 27, 2013 and April 6, 2015, the Court focuses on her medical history after April 6, 2015. The following summary is based on all the medical evidence in the Administrative Record, including the supplemental records submitted by Plaintiff and the supplemental records submitted by Defendant, to the extent they are allowed in the Administrative Record, as explained below.

   a. <u>Treatment and evaluation—through October 6, 2014 surgery</u>

In her initial application for LTD benefits, Plaintiff described her inability to continue her full-time attorney position "on account of a series of inter-related medical conditions, resulting in major surgery, which disabled her a year after she began working for the [law] firm." AR 229.

Plaintiff sought treatment in November of 2013 because of concerns with her cognition that were affecting her work. AR 229. She had previously experienced joint issues related to Ehlers-Danlos syndrome ("EDS"), Type III. AR 229. After reviewing an MRI of Plaintiff's cervical spine, Dr. Pocinki, an expert in joint mobility and EDS, diagnosed Plaintiff with "cervicomedullary syndrome, a condition where pressure on the brain stem causes numerous and varied neurological, including in her case cognitive problems, weakness, impaired coordination, bladder problems, numbness, tingling, and other sensory disturbances." AR 230. Plaintiff had a limited ability to concentrate and would have brief fainting spells, "precipitated by a 'pop' in her neck, which would cause her suddenly to fall to the ground and lose consciousness." AR 230.

Dr. Xi Besha conducted a neuropsychological evaluation of Plaintiff on January 7, 2014[2], in which she concluded that depression was the "most prominent finding" and Plaintiff was "cognitively okay." AR 215. Dr. Besha noted that Plaintiff had not had "significant problems with driving, but she had instances of forgetting how to steer her car backwards." AR 215. Dr. Besha concluded that Plaintiff performed well on the neuropsychological evaluation,

> with most scores falling in the superior to average range, suggesting that she has sufficient cognitive resources to function productively. She was somewhat slow on a test of simple psychomotor speed, but she performed normally on a more difficult test of complex psychomotor speed and she was not particularly slow on other timed tasks. Taken together, her pattern of performance is not particularly suggestive of difficulty with processing speed. Her other poor performance occurred on a test of sustained visual attention and inhibitory control, which could be related to her significant symptoms of depression, medication side effects (tramadol, nortriptyline, carisoprodol, Percocet), recent marijuana use, chronic pain, and subcortical white matter change. Of marked concern in this case is Ms. Gary's affective functioning. She has a history of severe depression with a suicide attempt. Currently, she reported experiencing significant symptoms of depression, particularly moderate to severe cognitive and affective depressive symptoms, on self-report questionnaires.

AR 218. Dr. Besha noted that Plaintiff was taking medications that could negatively affect her cognition and that, because cognitive deficits are associated with acute cannabis use, Plaintiff was encouraged to stop using marijuana. AR 218. Plaintiff reported that she smoked marijuana the day before the evaluation. AR 216.

After a year of experimentation with conservative treatment measures and multiple visits to Dr. Pocinki and Dr. Fraser Henderson, a neurosurgeon, Drs. Pocinki and Henderson recommended surgery. On October 6, 2014, Plaintiff underwent a "suboccipital decompression, reduction, and occipitoaxial fusion-stabilization surgery." AR 254-57. Plaintiff was advised by Dr. Henderson that, because of the EDS, "there would be a number of symptoms that remain and may progress even after surgery and despite a successful surgical procedure." AR 255. He also

---

[2] Dr. Besha's evaluation is dated January 7, 2013, but it is clear that it was in fact conducted on January 7, 2014. *See, e.g.,* AR 1546 (noting the error in the date of Dr. Besha's evaluation).

noted that while this had been a successful surgery for some patients, sometimes it could take "six months for normal activation of the muscle and return to normal neck function." AR 860.

While the surgery helped with Plaintiff's cognitive issues, it did not resolve them completely, nor did it resolve her physical problems such as chronic pain. AR 237. Soon after the surgery, Plaintiff moved from Maryland to Oregon, where she has been under the care of multiple health care providers and specialists to help recover from the surgery and to treat the symptoms related to the underlying diseases which caused the need for surgery. She has also returned as needed to Maryland for follow-up consultations with Drs. Pocinki and Henderson.

b. <u>Recovery from surgery and ongoing medical issues—October 6, 2014 to April 6, 2015 (date of termination of Plaintiff's LTD benefits)</u>

On November 18, 2014, Plaintiff was evaluated by Physical Therapist Chelsea Mills at the Southtowne Medical Clinic in Oregon, who noted Plaintiff's decreased postural and core strength, inability to sit for more than 20 minutes, and inability to walk for more than 16 minutes, due to neck pain, spasms, and decreased strength following her surgery. AR 252.

On November 25, 2014, Plaintiff was seen by Dr. William Hinz at the Gateway Medical Center Rheumatology in Oregon, to reestablish care for her EDS. AR 276. Dr. Hinz noted that "technically there is no intervention for Ehlers-Danlos" but he monitored her joint pain and symptoms from hypermobility. AR 276. Dr. Hinz noted that Plaintiff wore a neck stabilizing brace. AR 276. He discussed with Plaintiff the importance of limiting her overall stress and anxiety in order to improve her joint pain. AR 277 He also noted that Plaintiff inquired about the use of medical marijuana, which he opined was "a reasonable option although we would have to have a discussion about the use of marijuana and opioids." AR 277.

On December 13, 2014, Dr. Pocinki submitted an "Attending Physician's Statement" to Mass Mutual Financial Group[3], an additional insurer of Plaintiff. AR 1539. He stated that Plaintiff was unable to perform sedentary work and he would expect her to be able to return to work in October of 2015. AR 1539.

On January 5, 2015, Plaintiff returned to Maryland for a post-surgery follow-up appointment with Dr. Henderson. AR 237. Dr. Henderson found the following:

> She has done very well. She obviously looks very much brighter. Her brain fog, dysphagia, and dysarthria have largely cleared. Her imbalance, clumsiness, weakness, word finding problems, cognitive issues, and memory problems have largely cleared. She does report, however, that now she is feeling more pain in her joints, particularly her shoulders, hips, and knees. We speculate this may be because her nerves are working better. She does not take NSAIDs because she is a non-metabolizer.

AR 237. He recommended a CT scan, as well as medication for her pain and anxiety. AR 237.

She was seen the following day by Dr. Pocinki, who noted that her cognitive function was much better, and she was thinking more clearly. AR 1359. However, her fatigue was still severe and "even upright posture wipes her out after about 40-45 minutes," AR 1359, which he attributed to long illness and inadequate pain control, AR 1356. Dr. Pocinki wrote that overall Plaintiff's "pain is worse." AR 1356. Dr. Pocinki noted lots of spasms in Plaintiff's neck, shoulders, and chest. AR 1356. Further, Plaintiff's subluxed knee was very painful. SR[4] 1356. Dr. Pocinki opined that it would likely take 12-18 months to rebuild Plaintiff's tone, stabilize large joints, and restore energy reserves. AR 1356. He increased her painkiller prescription amounts. AR 1356.

---

[3] Plaintiff was enrolled in two LTD plans, one administered by Mass Mutual and the other by Defendant. Mass Mutual approved Plaintiff's claim. AR 1460-61.
[4] Cites to "SR" refer to the Supplemental Record submitted by Plaintiff, pursuant to this Court's September 6, 2018 Opinion & Order. *See* ECF 45.

On March 2, 2015, Plaintiff was seen again by Dr. Hinz. He wrote that "she is recovering well and may be able to return to her law profession in a year or two." SR 50. Plaintiff was slowly increasing her physical therapy and working with a physical therapist. SR 50. Dr. Hinz wrote that she "is currently disabled." SR 52.

    c.   <u>Records from April 6, 2015 through July 26, 2017 (date of Defendant's Final Denial)</u>

On May 11, 2015, Plaintiff had a cervical spine CT scan that revealed the following:

1. There are postsurgical changes at the C1-C2 level from posterior fusion as described below. The fusion appears intact.

2. Minimal spondylotic changes at the C2-C3 and C3-C4 levels with right-sided uncinate joint hypertropic changes. No other significant degenerative changes are noted.

3. No other radiographic abnormalities of the cervical spine are identified.

4. Probable postsurgical dystrophic calcification in the soft tissues posterior to C2 and C3.

SR 48.

On July 7, 2015, Dr. Pocinki spoke with a consulting doctor from Mass Mutual insurance and described Plaintiff's reports of multiple dislocations exacerbated by deconditioning. SR 12. He anticipated that it might take over a year for the dislocations to improve as muscle tone improved with physical therapy. SR 13.

On August 11, 2015, Plaintiff was seen by Dr. Hinz. SR 43. He wrote that she had slowly increased her physical activity and was working with a physical therapist. SR 43. On exam, Plaintiff "demonstrate[d] several pain and points in her back and several painful spinous processes throughout cervical thoracic and lumbar spine." SR 45. Her rotator cuff was intact, and it was an "otherwise normal exam of bilateral shoulders hips and knees without effusions or

deformity." SR 45. Her muscle strength was "5 out of 5 in all extremities." SR 45. She was in a neck-stabilizing brace. SR 45.

Plaintiff also sought treatment from a gastroenterologist. On August 14, 2015, she was seen by Dr. Ryan De Lee for abdominal pain, nausea, vomiting, regurgitation, and dyspepsia. AR 280. Dr. De Lee noted that Plaintiff's EDS is "significant", and she has "spontaneously subluxed neck vertebrae in her sleep." AR 280. He also noted that she was taking tramadol, soma, Percocet, nortriptyline, oxycontin, Cymbalta, and marijuana. AR 280. He discussed with Plaintiff that "her medical condition has seemingly painted her into a corner with narcotics," and he wrote that he was unable to prove that she had EDS-induced gastroparesis, given her multiple medications. AR 284.

A month later, on September 15, 2015, Plaintiff was seen by Dr. Gary Brandt at the Oregon Medical Group for follow-up for complex chronic pain management. AR 286. Dr. Brandt assessed Plaintiff with chronic multifactorial pain associated with hypermobility syndrome, EDS, and endometriosis. AR 286. Plaintiff reported that she was not driving. AR 286.

On November 24, 2015, Plaintiff was seen at the OHSU Center for Women's Health by Nurse Practitioner Meera Kanakia. AR 291-96. Plaintiff needed treatment for chronic pain and a refill of her oxycontin prescription. AR 292-93. NP Kanakia agreed to explore an exception to OHSU's policy of not combining opioids with medical marijuana. AR 296.

On February 25, 2016, NP Kanakia saw Plaintiff for "medication management." SR 142-146. On July 12, 2016, NP Kanakia wrote a letter regarding Plaintiff, in which she stated that Plaintiff continued to suffer from multiple symptoms that prevent her from working, "particularly as an attorney," including intractable muscle spasms in her neck and shoulders, pain, fatigue, dizziness, and nausea. AR 291. Plaintiff was unable to drive an automobile and had

to lay down at various unpredictable times throughout the day due to her symptoms. AR 291. Plaintiff continued to have impairment of reflexes and balance, and she required medication that would impair her work performance. AR 291.

NP Kanakia saw Plaintiff again for medical refills on August 22, 2016. SR 151. NP Kanakia wrote that Plaintiff was having difficulty with fatigue and attention span. SR 151. Plaintiff thought she could start working 12 hours a week "as long as not sitting at a desk which exacerbates her pain." SR 151. NP Kanakia noted that Plaintiff "does not drive" and started regular exercise. SR 152. Plaintiff hoped to start part-time work in October once she was cleared by her neurosurgeon. SR 154.

On October 10, 2016, Dr. Henderson wrote to NP Kanakia, summarizing his findings after meeting with Plaintiff. AR 853. Dr. Henderson noted that Plaintiff reported that her memory, sensation, weakness, blackout, and word retrieval problems had resolved. AR 853. However, Plaintiff still had some memory, concentration, and reflex issues, according to Dr. Henderson. AR 853. She also had muscle spasms, urinary difficulties, and shoulder and neck pain. AR 853. Dr. Henderson also noted some imbalance, hyperolfaction, photosensitivity, choking, paresthesias, nausea, dysphagia, altered "sleep architecture," and muscle cramping. AR 853. Plaintiff described a feeling of instability in her neck and she had several episodes where neck spasms caused her to fall with resulting full-body weakness. AR 853. She also had occasional hallucinations in her peripheral vision. AR 853. Dr. Henderson examined Plaintiff and noted that she was "severely hyperreflexic," had some "patchy sensory loss over the shoulders," no specific weakness, normal gait and cerebellar testing, and significant tenderness behind the cervical spine. AR 853.

On October 11, 2016, Plaintiff was seen by Dr. Pocinki. AR 1421. While overall her neurological problems were better, she experienced persistent pain, fatigue, and spasms, including a pinched nerve in her right shoulder. AR 1421. She had been doing well exercising in a pool several times a week, but recently she had more spasms in her neck and shoulder. AR 1421-22. Plaintiff had to wear a hard neck brace to tolerate more than 15 minutes of sitting and, even then, she could only tolerate 90 minutes. AR 1422. She was able to walk some and drive locally to do short errands. AR 1422. However, she was exhausted by 7 p.m. and probably only capable of 4-5 hours of light activity with frequent breaks. AR 1422. Dr. Pocinki stated that the addition of a muscle relaxant and increased tramadol might help Plaintiff, but "finding the right muscle relaxant might be trial + error." AR 1422. Plaintiff submits a declaration attesting that Dr. Pocinki told her she could work no more than four hours a week, two shifts of two hours apiece. AR 1447. He also told her that working any more than that would adversely affect her recovery. AR 1447.

On November 6, 2016, Dr. Pocinki wrote to Defendant, responding to a request for additional information and analysis. AR 982. Dr. Pocinki strongly disagreed with the opinion of Dr. James Haller, Defendant's medical consultant. AR 982. Whereas Dr. Haller found that physical examination findings would not preclude sedentary physical demands, Dr. Pocinki stated that Plaintiff was not capable of prolonged sitting. AR 984. He also stated that Plaintiff "could not exert 10 pounds of force to lift, carry, push, pull, etc. for anything close to one third of an 8-hour day without sustaining significant injury." AR 984.

As to Plaintiff's cognitive limitations, Dr. Pocinki rebutted Dr. Haller's conclusion that Plaintiff could direct, control, or plan activities for others; influence people in their opinions,

attitudes, and judgments; or make judgments and decisions. AR 984. Dr. Pocinki pointed to his

chart notes from November 19, 2013 and September of 2014. AR 984-85.

Dr. Pocinki submitted another "Attending Physician's Statement on Disability" to Mass

Mutual on November 6, 2016. SR 10-11. Dr. Pocinki opined that Plaintiff was "[n]ot able to

sustain physical or cognitive activity for more than a few short periods a day" and her expected

return to work date was "unknown." SR 10-11. He selected "less than sedentary physical

capacity" to describe the degree of work Plaintiff was able to perform. SR 11.

On November 9, 2016, Plaintiff saw NP Kanakia, who noted that Plaintiff's

"neurosurgeon and neurologist are concerned that her muscle spasms are neurologically related."

SR 155. Plaintiff reported that her pain felt "much improved." SR 155.

On November 29, 2016, Dr. Henderson sent another letter to NP Kanakia, in which he

followed up with the results of Plaintiff's MRI. SR 33. He wrote that she was "three years status

post C1/2 fusion and stabilization for atlantoaxial instability with excellent relief of her

symptoms, that is until recently." SR 33. Plaintiff was "now having some memory issues,

concentration issues, hyperreflexia, muscle spasms, and urinary difficulties." SR 33. Her pain

was 6/10 and sometimes 9/10, and "[s]he did have some hyperreflexia, some patchy sensory loss,

and tenderness behind the mid cervical spine on exam." SR 33. He wrote, "[s]he is otherwise

intact." SR 33. As to the MRI, he wrote as follows:

> The flexion-extension MRI shows no evidence of craniocervical instability, no Chiari
> malformation, and the appearance of good CSF flow through the skull base and down the
> cervical spine. There are degenerative discs at every level. The spine cord is without any
> compression or signal change. There is no evidence of instability on the cervical MRI
> film.
>
> Therefore, I am uncertain as to the cause of her problems. An MRV of the brain with
> contract may be helpful if she continues to have headaches. We have found that many
> patients with pseudotumor cerebri (benign intracranial hypertension) had a thrombosis or
> narrowing of the major dural venous sinuses. Investigation of the sinus then would be my
> next avenue of approach.

SR 33.

Plaintiff met with NP Kanakia again on December 12, 2016, who strongly recommended that Plaintiff meet with the pain management clinic. SR 165. Plaintiff was resistant because "she is not interested in discontinuing her pain medication, which is what they would recommend." SR 165.

On March 7, 2017, Plaintiff met with Dr. Hetal Choxi for medication management. SR 166. Plaintiff was taking Cymbalta, gabapentin, Soma, dantrolene, OxyContin, tramadol, Percocet, and medical marijuana for her pain. SR 166. Dr. Choxi wrote:

> She has chronic fatigue [which] is ongoing and severely limiting her function. She also has autonomic dysfunction in the form of heat intolerance and cold intolerance. It makes it difficult for her to get in and out of pool to do rehabilitation. She does not get postural hypotension. She also notes some numbness and tingling in her hands intermittently.

SR 166.

Plaintiff had another visit with Dr. Hinz on April 17, 2017. SR 34. He wrote that "she has continued trouble with dislocations, recently her left knee." SR 34. She still had neck pains and instability, and she wore a neck brace with driving. SR 34. He continued to write that Plaintiff was disabled. SR 37.

Plaintiff was seen again by Dr. Choxi on May 16, 2017, and the following notes were written in her chart:

> In terms of her Ehlers-Danlos syndrome she sees to [*sic*] specialists in Maryland. She follows with Dr. [Pocinki]. She was also seeing a neurosurgeon every 6 months for her Ehlers-Danlos as well as her spinal cord injury. She reports that her neurosurgeon stated that she no longer needs to follow him after her last MRI this fall. . ..

> Without opioid therapy she has no sleep. With opioid therapy she is able to do exercises regularly to maintain her strength to prolong her life. Her goals that she accomplishes is able [*sic*]to grocery shop daily, prepare at least one meal a day for herself, and do other daily activities. She is unable to do any of these things without these medications. Exercises including pool 3x/week and PT 2-3x/week for 1 hour.

SR 167. On May 26, 2017, following an injury, Dr. Choxi performed an exam was which was "unremarkable" and, thus, Dr. Choxi told Plaintiff that it was safe to no longer use a neck brace. SR 171.

On June 1, 2017, clinical neuropsychologist Dr. Tracy Kreiling was retained by Plaintiff's attorney to review Dr. Besha's January 7, 2014 evaluation and opine whether "Dr. Besha's work can support the proposition that Ms. Gary suffered no loss in cognition on or about November 27, 2013, relevant to the material duties listed by [Defendant]." AR 1546. Dr. Kreiling also reviewed the conclusions of Dr. Black, Defendant's neuropsychologist. AR 1546. Dr. Kreiling received from Defendant copies of the neuropsychological report but was told that the raw data was not available because Dr. Besha had never provided it to Defendant. AR 1546.

Dr. Kreiling disagreed with Dr. Besha's conclusion that Plaintiff had sufficient cognitive resources to function productively. AR 1547. Dr. Kreiling reviewed Plaintiff's test scores and found results in the low average, borderline, and impaired range, which would reflect a decline from a previously higher level of functioning. AR 1547. She also concluded that the cognitive test results obtained during Dr. Besha's evaluation were consistent with Dr. Pocinki's and Dr. Henderson's observations of Plaintiff's problems with sustained attention and concentration, and trouble with word finding. AR 1547.

According to Dr. Kreiling,

Ms. Gary's neuropsychological evaluation results revealed a decline in her ability to rapidly process information, sustain her attention, inhibit an inappropriate response, and shift mental set in the context of significant depressive symptomology and pain. Cognition was otherwise intact.

AR 1547. Dr. Kreiling explained that pain and emotional distress would interfere with Plaintiff's ability to engage in a demanding work environment. She also wrote that Dr. Besha should have asked Plaintiff to abstain from marijuana use for a minimum of 24 hours prior to testing, in order

to rule out any effects of the marijuana on the test results. AR 1547. Dr. Kreiling found that Plaintiff's "neurocognitive findings reveal a decline in aspects of cognition that . . . would have had a significant negative impact on her ability to function as an attorney in January of 2014." AR 1548. Specifically, Dr. Kreiling believed that Plaintiff would be impaired in her ability to perform material duties of an attorney, such as frequently changing tasks and attending to information, and formulating plans, practices, and procedures at the level of complexity required to be an attorney. AR 1548.

d. Records from July 26, 2017 (date of Final Denial) through January 22, 2018 (allowable time for Plaintiff to supplement the Administrative Record)

On September 1, 2017, Dr. Pocinki examined Plaintiff and on September 2, 2017, he provided a letter to Plaintiff's attorney in which he responded to specific questions regarding Plaintiff's physical and cognitive limitations. SR 1. He wrote that he was "disappointed to see that, although she reported her overall condition as stable, it certainly was no better than when [he] had seen her a year ago." SR 1. He went on to describe significant cognitive and physical limitations, including maintaining conversation, reading and writing, ability to sit for prolonged periods of time, and ability to exert up to 10 pounds of force. SR 2. When asked about Defendant's orthosurgeon's assessment that Plaintiff was able to work as of April 6, 2015, Dr. Pocinki opined that the surgeon "clearly limited his or her evaluation to the sequelae of her surgery and the neurologic symptoms related directly to her craniocervical problem . . . when in fact her ongoing disability is related to her underlying chronic diseases, and the effects of Ehlers Danlos syndrome on her other joints and systems, rather than to her surgery." SR 2.

On November 11, 2017, Dr. Kreiling performed her own neuropsychological evaluation of Plaintiff. Dr. Kreiling concluded that Plaintiff was unable to perform the material and substantial cognitive duties required to be an attorney, including performing a variety of duties

involving frequent changes in tasks without losing her composure or efficiency. SR 55. Dr.

Kreiling summarized her findings as follows:

> Overall, the present pattern of neuropsychological test performance reveals impairment in sustained auditory and visual attention, response control, and visual memory. Additionally, given her estimated intellectual functioning in the very superior range, performance on tasks of cognitive flexibility and response persistence was lower than would be expected. Cognition was otherwise intact. Responses on measures of emotional functioning suggest significant concern about physical conditions and cognitive abilities, with possible underreported depression. The etiology of Mrs. Gary's cognitive difficulties is multifactorial, including ongoing pain, fatigue, stress, and emotional distress.

SR. 54. In order to reach this conclusion, Dr. Kreiling interviewed Plaintiff and reviewed

"available records." SR 55. Dr. Kreiling did not specify which records she reviewed. SR 55. Dr.

Kreiling noted that Plaintiff can only drive for short periods of time, but she does not like to

drive because she feels that she cannot attend to all the things she needs to while driving. SR 55.

## IV. Defendant's Paper Reviews of Plaintiff's File

### a. Physical limitations

After Plaintiff appealed Defendant's initial denial of her claim, Defendant retained

orthopedic surgeon Edward Dunn to review Plaintiff's medical records and opine whether

Plaintiff's physical limitations prevent her from performing the occupational demands of an

attorney. AR 637. Dr. Dunn provided his response on July 8, 2017. AR 637.

Dr. Dunn concluded that there was no consistent supporting information for restrictions

and limitations that would prevent Plaintiff from performing the physical requirements of her

occupation. AR 1640. Dr. Dunn acknowledged that Dr. Henderson responded to Defendant's

questionnaire on October 21, 2016 and listed the following as reasons Plaintiff could not perform

the physical requirements of her occupation: pain, nausea, weakness, and atlanto-axial

instability. AR 1640. However, Dr. Dunn countered Dr. Henderson's response by noting that the

records stated that Plaintiff's nausea improved after her surgery and the records did not

document any upper extremity weakness "below 4/5." AR 1640. Further, the most recent exam by Dr. Henderson did not document any axial instability. AR 1640. Dr. Dunn also found that, despite her pain, Plaintiff could drive and perform activities of daily living. AR 1640.

Considering Plaintiff's October 6, 2014 surgery, Dr. Dunn opined that a six-month recovery period was reasonable. AR 1640. Thus, he found her restricted from performing the physical requirements of her profession from October 6, 2014 to April 6, 2015. AR 1640. However, after that date, he did not find her restricted. AR 1640. Finally, Dr. Dunn wrote that additional information was needed due to the "relative lack of physical examination findings in Dr. Pocinki's office visit notes and the question of whether the occiput-C1 portion of the insured's surgery is fused." AR 1640. Dr. Dunn recommended an IME with an orthopedic spine surgeon with significant experience in surgery of the cervical spine. AR 1640.

However, less than two weeks later, Dr. Dunn changed his mind. AR 1650. In response to follow-up questions from Defendant, Dr. Dunn "re-reviewed the medical records" and his previous report and opinions. AR 1649. In response to a question as to whether he still felt that an IME was necessary, Dr. Dunn wrote definitively "No. The insured's cervical spine has been stabilized by the surgery carried out by Dr. Henderson." AR 1650. He wrote:

> It is not uncommon for some preoperative physical signs to linger after surgery of this type but now that the C1-C2 level has been fused and the clivo-axial angles has been stabilized to an acceptable level, the presence of these lingering signs, such as hyperreflexia, mild weakness, mild sensory loss and difficulty in tandem gait, would not be expected to preclude the insured from performing the physical demands of her occupation.

AR 1651.

Dr. Scott Norris also conducted a review of Plaintiff's records on July 21, 2017 and November 21, 2018. He concluded that the restrictions and limitations imposed by Plaintiff's treating physicians were unsupported:

> Physical examinations did not describe findings that would preclude sedentary level activity after 4/6/15. Physical examinations did not describe findings that would preclude peripheral joint, spine, or other findings that would preclude sedentary level work.

AR 2146. Imaging studies did not identify excessive degenerative changes or deformity. AR 2148. Diagnostic testing "did not identify structural disease or other pathologic conditions c/w the severity of functional loss as reported by the EE or with other indicators of impairment that would preclude sedentary level activity." AR 2148. Clinical records indicated that Plaintiff reported adequate control of her pain; thus, Dr. Norris did not agree with Dr. Henderson's opinion regarding severe pain, nausea, weakness, and atlantoaxial instability. AR 2149. Dr. Norris noted that Dr. Henderson's opinion was inconsistent with his prior opinion and clinical evidence that the cervical spine was stable. AR 2149.

Dr. Norris noted that Plaintiff was not seen by Dr. Pocinki from January 2015 to October 2016. AR 2150. Dr. Norris found that Dr. Pocinki's September 27, 2017 opinion that Plaintiff remained profoundly impaired was inconsistent with "mild to occasionally moderate findings on examinations and the level of reported activities." AR 2150.

b. Cognitive limitations

On January 20, 2017, Defendant's internal consulting neuropsychologist, Dr. William Black, conducted a records review. AR 1057-59. While he noted that Dr. Besha's raw test data was not available, he reviewed her report and concluded that the records did not support a decrease in capacity from February 7, 2015 to the present. AR 1059. He did not explain, nor are the records clear, why he was asked to use the February 7, 2015 date to measure Plaintiff's abilities. He found that the cognitive restrictions and limitations were unsupported. AR 1059. He summarized as follows:

> No neuropsychological or mental status evaluations have been conducted since 1-7-14, nor is there evidence of mental health evaluation/treatment. There is no additional

cognitive or emotional information that would support cognitive/BH R&Ls. . .. As of the date of the 1-7-14 neuropsychological evaluation, the insured had the cognitive capacity to meet the demands of her occupation as an associate attorney as enumerated by VRC. As file information indicates that the insured's cognitive issues has largely resolved, there is no expectation of a change in cognitive capacity from 2014 to date.

AR 1059.

Defendant retained Dr. Jana Zimmerman on July 13, 2017 to assess Plaintiff's cognitive limitations. AR 1641. Dr. Zimmerman was asked to review Dr. Besha's raw data and January 7, 2014 testing report and Dr. Kreiling's June 1, 2017 letter, and opine whether she agreed with Dr. Kreiling's conclusions. AR 1641. Dr. Zimmerman did not weigh in as to Plaintiff's physical condition. AR 1642.

Dr. Zimmerman disagreed with Dr. Kreiling's conclusion regarding a decline in Plaintiff's cognitive abilities. AR 1643. She did not find documentation of word finding deficits and concluded that the results of the computerized test of sustained attention and inhibitory control were "invalid due to failed embedded performance validity tests." AR 1643. She explained:

> This meant that the insured's scores corresponded to mixed psychiatric (depression, somatization and pain, and substance use disorders, etc.) and neurologic (TBI, seizure disorder, fibromyalgia, etc.) patients with noncredible performance on this test.

AR 1643. Dr. Zimmerman noted insufficient data to reach certain conclusions, including the following: whether the extremely high scores on the clinical scale Somatic Complaints (94) and other related subscales and somewhat lower scores on the clinical scale were valid; and what the effect was of substance-related factors of the cognitive test results. AR 1644. Finally, Dr. Zimmerman agreed with Dr. Kreiling that test administration should have been rescheduled "when Dr. Besha learned the insured had used marijuana in the past 24 hours particularly in the context of a medication regimen that included other potentially addictive and sedating agents (e.g. two narcotics and relaxant)." AR 1644.

Dr. Zimmerman conducted another records review on November 16, 2018, in which she reviewed Dr. Kreiling's November 11, 2017 neuropsychological evaluation report in addition to Dr. Besha's report. However, Dr. Kreiling did not provide all her raw data to Defendant, which made some of Dr. Zimmerman's opinions inconclusive as to the basis or validity of Dr. Kreiling's conclusions. AR 2141. However, she did note that "this pattern of cognitive test results occurred in the context of reported pain from recent injury (though not reported three days later in PCP visit), unspecified medication/substance usage prior to the test, and high levels of symptom distress and psychopathology endorsed in personality testing." AR 2141. "Critically, this multifactorial etiology is subject to transient and/or impermanent symptom fluctuation and would reflect the insured's cognitive and psychiatric status near the exam and not dating back to benefit end date to the present—if reported psychiatric symptoms and cognitive test results are supported by valid test results." AR 2141. Thus, even if Dr. Kreiling's test was accurate, it would reflect Plaintiff's cognitive limitations in November of 2017, not in April of 2015.

## V.    Final Denial Letter

On July 26, 2017, Defendant issued its Final Decision following Plaintiff's appeal of Defendant's Initial Decision. AR 1746. The Final Decision concluded that Plaintiff was disabled from November 27, 2013, through April 6, 2015. AR 1747. She was approved for LTD benefit payments for that period. AR 1747. However, Defendant concluded that after April 6, 2015, Plaintiff "was able to perform the duties of her regular occupation and no longer met the definition of disability in the policies." AR 1747.

Defendant's vocational resource indicated that Plaintiff's regular occupation required a sedentary level of physical exertion. Defendant summarized the information used to make its determination and noted that two physicians who reviewed the claim file information for

Defendant concluded the medical information did not support a finding that Plaintiff was unable to perform sedentary activities. AR 1747. Defendant concluded:

> Restrictions that would have precluded Ms. Gary from performing her regular occupation were supported through the surgery on Oct. 6, 2014, and for a six month surgical recovery period through April 6, 2015. Thereafter, her cervical spine was stable and clinical and imaging findings had improved so that she was no longer precluded from performing the sedentary functional demands required by her regular occupation.

> After April 6, 205, Ms. Gary's other conditions, including EDS, no longer precluded her from performing the sedentary functional demands required by her regular occupation. This is based upon her examination findings, diagnostic testing and imaging, intensity and frequency of treatment, and her activities being consistent with full-time sedentary functional capacity.

AR 1753.

As to Plaintiff's cognitive abilities, Defendant concluded that she was not impaired as of January 4, 2014, the date of Dr. Besha's neuropsychological evaluation. AR 1753 ("Our neuropsychologist does not agree with Dr. Kreiling's conclusions.").

## STANDARDS

Traditionally, summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). However,

> [t]raditional summary judgment principles have limited application in ERISA cases governed by the abuse of discretion standard. Where, as here, the abuse of discretion standard applies in an ERISA benefits denial case, a motion for summary judgment is, in most respects, merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply.

*Stephan v. Unum Life Ins. Co. of Am.*, 697 F.3d 917, 929–30 (9th Cir. 2012) (citations, internal quotation marks omitted). Additionally, "judicial review of benefits determinations is limited to the administrative record—that is, the record upon which the plan administrator relied in making its benefits decision[.]" *Id.* at 930 (internal quotation marks omitted).

"[W]hen a court must decide how much weight to give a conflict of interest under the abuse of discretion standard[,] ... the court may consider evidence outside the [administrative] record." *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 970 (9th Cir. 2006) (en banc); *Stephan,* 697 F.3d at 940 (When evaluating the "nature, extent, and effect on the decision-making process of any conflict of interest," the district court "*may,* in its *discretion,* consider evidence outside the administrative record."). When considering the nature and impact of a conflict of interest, traditional rules of summary judgment apply, and "summary judgment may only be granted if after viewing the evidence in the light most favorable to the non-moving party, there are no genuine issues of material fact." *Stephan*, 697 F.3d at 930 (internal quotation marks and brackets omitted).

"[T]he decision on the merits, though, must rest on the administrative record once the conflict (if any) has been established, by extrinsic evidence or otherwise." *Abatie*, 458 F.3d at 970.

## DISCUSSION

### I.     Plaintiff's Motion to Strike

On September 6, 2018, the Court granted in part Plaintiff's motion to expand the Administrative Record by allowing Plaintiff to supplement the record "with medical evidence in existence on or before January 22, 2018." Sept. 6, 2018 Op. at 8. The goal was to provide Plaintiff an opportunity to recreate what the Administrative Record would have been had Defendant given Plaintiff 180 days to appeal the July 26, 2017 denial based on its "new reason" of ending benefits on April 6, 2015.

On September 27, 2018, the Court held a telephone scheduling conference with the parties in which it ruled that Defendant could submit supplemental records as well, with the understanding that the Court would rule as to their admissibility in this Opinion.

On November 30, 2018, Defendant filed the following 391 pages of supplemental records:

1. A copy of this Court's September 2018 Opinion & Order (AR 1781-1802);
2. A duplicate of plaintiff's Supplemental Record (AR 1804-1978);
3. A "Twitter update" consisting of 92 pages of posts by Plaintiff from May 2018 through October 2018 (AR 1981-2072);
4. An article announcing Plaintiff's failed attempt to become an Oregonian writer in 2015 (AR 2074-78);
5. A letter from Defendant to Plaintiff's counsel on November 29, 2018, denying Plaintiff's claim once again (AR 2159-2165); and
6. Defendant's administrative notes created between October 1, 2018 and November 30, 2018 (AR 1777-1780; 1803; 1781-1802; 1979-1980; 2073; 2079-2158; 2167-68).

Def.'s Supp. R., ECF 49.

Plaintiff moves to strike all the materials submitted by Defendant, except for the following:

1. Internal review by Dr. Zimmerman on November 16, 2018 (AR 2129-2144);
2. 13 pages related to Dr. Zimmerman's contention that she did not receive Dr. Kreiling's raw test data (AR 2088; 2103-07; 2123-26); and
3. Internal review by Dr. Norris on November 21, 2018 (AR 2145-50).

Pl.'s Mot. Strike 4, ECF 52.

The Court grants Plaintiff's motion. As this Court has previously explained, the goal of allowing supplemental medical evidence is to place Plaintiff in the position she would have been in had Defendant allowed her to appeal the July 26, 2017 Final Decision within 180 days. To the extent that the Court allows Defendant to submit supplemental records, it must also be with that goal in mind. If Plaintiff had been allowed to submit supplemental medical evidence between July 26, 2017 and January 22, 2018, Defendant could have had its internal medical reviewers

respond to the additional evidence. For that reason, the Court allows the internal reviews by Drs. Zimmerman and Norris from November of 2018 to become part of the Administrative Record.

Materials generated after January 22, 2018 that are not reviews of medical evidence generated before January 22, 2018, however, do not fit the Court's criteria. For that reason, the Court strikes Defendant's submission of Plaintiff's Twitter posts from May 2018 through October 2018. Following this rationale, materials that were available but not incorporated by Defendant prior to its Final Decision are also not properly admitted now. Therefore, the 2015 Oregonian article must be struck.

The Court also strikes records submitted by Defendant that do not comply with the Court's allowance for Defendant to respond to the medical evidence submitted by Plaintiff. There is no need for Defendant to submit this Court's September 2018 Opinion & Order, which is already in the docket of this case. There is even less of a need to duplicate all of Plaintiff's supplemental records, which are already part of the Administrative Record. Such duplication overcomplicates an already voluminous record.

As to Defendant's administrative notes created between October 1, 2018 and November 30, 2018, and Defendant's November 29, 2018 claim denial letter (the "Remand Letter") to Plaintiff, the Court strikes them as well. Defendant argues that the Court must takes these records into account pursuant to the Ninth Circuit's *Saffon* and relevant regulations. *See Saffon,* 522 F.3d at 873. Defendant contends that it must place all material generated in a review in the record. Def.'s Opp. Pl.'s Mot. Strike (citing 29 C.F.R. § 2560-503-1(h)(2)(iii)). Defendant, however, ignores the procedural posture and specific facts of this case.

As this Court explained in its September 6, 2018 Opinion:

Neither *Abatie* nor *Saffon* prescribe what evidence district courts should allow in "new reason" cases. As can be seen from these two cases, the evidence is particular to each

> case. However, both cases support the conclusion that putting the plan participant in the position he or she would have been but for the procedural violation is the goal.

Sept. 6, 2018 Op. at 7. Here, by offering a "new reason" to deny Plaintiff's claim in its July 26, 2017 Final Decision, Defendant deprived Plaintiff of the opportunity to appeal her claim denial with the knowledge that Defendant found her no longer disabled after April 6, 2015. Therefore, the Court allowed Plaintiff to submit supplemental medical evidence, up until January 22, 2018. The Court also made clear that the next step, after the supplemental evidence was received, would be to issue a ruling on the parties' cross motions for summary judgment. *See* Sept. 6, 2018 Op. at 22; Minutes of Proceeding, Sept. 27, 2018, ECF 47.

At no point did the Court remand to Defendant the issue of whether Plaintiff is disabled. *Saffon* has made clear that the District Court is authorized to decide that issue in circumstances such as those here—where procedural irregularities have prevented the full development of the Administrative Record and the District Court allows additional evidence. *Saffon*, 522 F.3d at 875 n.6. Therefore, Defendant cannot use a newly created claim denial letter from November of 2018, which it created on its own initiative and not pursuant to this Court's direction, as additional evidence to support the reasonableness of its July 2017 Final Decision.[5] Similarly, internal administrative notes created by Defendant in October and November of 2018 are not a response to Plaintiff's supplemental medical evidence, as allowed by the Court, nor do they help the Court decide whether Defendant's July 2017 Final Decision was an abuse of discretion. The

---

[5] In its November 29, 2018 letter, Defendant states that "[o]n September 6, 2018, this LTD claim was remanded back to Unum for review of additional medical information in order for Unum to determine whether that information supported the payment of additional LTD benefits after April 6, 2015." AR 2161. This misstates the Court's Order, which directed the parties to submit additional medical information to the Court to incorporate in its review of Defendant's Final Denial of LTD benefits. While the Court recognized it was possible that Defendant would independently decide to award Plaintiff LTD benefits once it reviewed her supplemental materials, the Court did not remand the issue for Defendant to issue a new decision letter.

Court strikes these records as well. In sum, the Court grants Plaintiff's motion to strike and considers only the following records in this Opinion & Order: AR 2129-2144; 2088; 2103-07; 2123-26; 2145-50.

As a final consideration regarding the supplementation of medical evidence, the Court notes a key dispute that runs throughout Plaintiff's and Defendant's voluminous briefing in this case: Whose responsibility is it to show Plaintiff's disability status as of April 6, 2015, the date on which Defendant ended Plaintiff's LTD benefits? While Plaintiff bears the burden of showing that she is entitled to benefits, *see* AR 1671, she had no notice prior to receiving Defendant's Final Decision that the April 6, 2015 date was significant. Plaintiff's appeal had focused on the date that Defendant had told Plaintiff was at issue—the 180-day "elimination period" ending on Mary 25, 2014. Nevertheless, it remains Plaintiff's burden to show she was still disabled as of April 6, 2015.[6] Because of this Court's remedy of Defendant's reliance on a "new reason" to deny Plaintiff's claim, the Administrative Record is now complete as to Plaintiff's medical evidence on or before January 22, 2018. Thus, the Court reviews the entire record to determine if Plaintiff meets her burden and whether Defendant's decision to deny Plaintiff benefits after April 6, 2015 was an abuse of discretion.

## II.     Standard of review

This Court has already ruled that the appropriate standard of review in this case is for an abuse of discretion. Sept. 6, 2018 Op. at 17. In reviewing for an abuse of discretion, an ERISA

---

[6] This Court has previously held that "Defendant's action [in issuing its Final Decision] is most reasonably understood as awarding a single, discreet time period of disability and not as awarding benefits and then independently and separately terminating them." *Gary v. Unum Life Ins. Co. of Am.*, No. 3:17-CV-01414-HZ, 2018 WL 1309991, at *9 (D. Or. Mar. 12, 2018). Therefore, Plaintiff's argument that her duties were to provide updates to Defendant when requested, as opposed to establishing an initial proof of disability for the entire time of her claimed disability, is not well taken. *See* Pl.'s Reply to Mot. Summ. J. at 12, ECF 61.

plan administrator's decision "will not be disturbed if reasonable." *Conkright v. Frommert,* 559 U.S. 506, 521 (2010) (internal quotation marks omitted). This reasonableness standard requires deference to the administrator's benefits decision unless it is "(1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts on the record." *Salomaa v. Honda Long Term Disability Plan,* 642 F.3d 666, 676 (9th Cir. 2011) (internal quotation marks omitted). "This abuse of discretion standard, however, is not the end of the story. Instead, the degree of skepticism with which we regard a plan administrator's decision when determining whether the administrator abused its discretion varies based upon the extent to which the decision appears to have been affected by a conflict of interest." *Stephan*, 697 F.3d at 929.

This Court already held that Defendant has a structural conflict of interest because it acts as both funding source and administrator. Sept. 6, 2018 Op. at 10. The Court must determine what weight to give the conflict. *Stephan*, 697 F.3d at 921. This Court noted in its prior Opinion that Plaintiff presented factors in support of its argument that the Court should examine Defendant's decision with a high level of skepticism. Sept. 6, 2018 Op. at 12. The Court deferred a determination of the appropriate level of skepticism to a decision as part of the merits of Plaintiff's complaint. *Id.* at 17. The Court now address the factors cited by Plaintiff in turn.

a. Bias from structural conflict

In *Metropolitan Life Insurance Company v. Glenn*, the Supreme Court noted that when judges review the lawfulness of benefit denials, they will often take into account several different considerations of which a conflict of interest is one:

> In such instances, any one factor will act as a tiebreaker when the other factors are closely balanced, the degree of closeness necessary depending upon the tiebreaking factor's inherent or case-specific importance. [A] conflict of interest ..., for example, should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims

administration. It should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances.

554 U.S. 105, 117 (2008).

Defendant argues that the structural conflict of interest in this case has little, if any, significance in the Court's review. Defendant notes it has taken steps to reduce any potential bias and to promote accuracy when processing claims, including completely separating the Appeals Unit from the Benefits Center where initial claims decisions are made. Connolly Decl., Jan. 16, 2019, ¶ 2, ECF 55. In addition, any medical or vocational professional who is consulted at the appeal level does not have any involvement in the adverse benefit determinations he or she is reviewing. *Id.* at ¶ 10. Karen Connolly, the Lead Appeals Specialist for Defendant who reviewed Plaintiff's case, is not given an appeal decision quota, target, or goal to attain. *Id.* at 7 14. Nor are her compensation and performance evaluations affected by whether she upholds or overturns an adverse benefit determination. *Id.* at ¶ 15.

Based on the steps Defendant has taken to reduce the inherent bias in its structural conflict, the Court finds that the conflict, standing alone, does not heighten the Court's scrutiny as it determines if Defendant abused its discretion.

b. "New reason" procedural violation

This Court already ruled that Defendant's procedural violation (§1133 "new reason" violation) did not compel a *de novo* standard of review but is one factor to consider as the Court assesses whether Defendant abused its discretion. Sept. 6, 2018 Op. at 13. The Court proceeds accordingly and considers Defendant's procedural violation in its evaluation of Defendant's requirement to engage in a meaningful dialogue with Plaintiff about the substance of her claims and its effort to gather all necessary medical evidence.

c. Malice

Plaintiff contends that Defendant's records demonstrate malice towards Plaintiff and that Defendant has treated Plaintiff as an adversary. Plaintiff contends that the following events demonstrate malice: the retroactive denial of Plaintiff's short-term disability benefits to February 10, 2014; the effort to chalk up Plaintiff's cognitive difficulties to her chronic marijuana use; Defendant's use of Plaintiff's effort to be a "Freelance Cannabis Critic" as relevant to determining her eligibility for disability benefits; Defendant's use of a quote from a portion of a medical note on December 9, 2013; and Defendant's opposition to Plaintiff's desire to conduct this case under a pseudonym. Pl.'s Mot. Expand Record 13-16, ECF 35 (incorporated by reference by Pl.'s Resp. Def.'s Mot. Summ. J., 21).

The Court is unpersuaded. The Court takes no position as to Defendant's decision to deny Plaintiff's STD benefits—a decision that was not appealed and is not at issue in this case. Plaintiff's marijuana use permeates her medical records and thus, Defendant's discussion of such use is inevitable. A selective quote, even if misleading, does not alone constitute malice. And finally, the Court granted Defendant's motion to compel Plaintiff to proceed under her full name, finding that Plaintiff's allegations of future harm were not severe enough to warrant proceeding anonymously, or anything more than speculative. Feb. 14, 2018 Op. at 10, ECF 23. In sum, Plaintiff fails to demonstrate malice on the part of Defendant.

d. "Parsimonious claims-granting history"

This Court's September 6, 2018 Opinion recognized the relevance of a history of biased decision-making, including a 2005 Multistate Agreement between Defendant and the insurance regulators of all fifty states regarding Defendant's claims process. Sept. 6, 2018 Op. at 18. However, the Court further noted: "While I do not anticipate excluding Plaintiff's evidence that

in a period fifteen to twenty years ago, Defendant was found to have a widespread practice of denying claims unjustly, that evidence carries little weight as to the claim processing in this case which occurred in 2016 and 2017." *Id.* at 20-21.

Now, Plaintiff revives its argument as to Defendant's parsimonious claims-granting history by pointing to this Court's 2013 decision, *Petrusich v. Unum Life Ins. Co. of Am.*, 984 F. Supp. 2d 1112, 1119 (D. Or. 2013), which found that Defendant had abused its discretion. Plaintiff also points to the fact that Plaintiff's claim under a parallel policy from Mass Mutual was approved and she was determined to be totally disabled.

The Court considers the *Petrusich* decision as it applies a level of skepticism to Defendant's decision. The Court also takes into account "the public record of Unum's history of biased decisionmaking." *See Stephan*, 697 F.3d at 917. However, in light of Defendant's evidence of the procedures it implemented to mitigate possible bias, the Court notes the history but does not give it great weight in assessing Defendant's behavior in this case.

e.  Reliance on paper review of Plaintiff's medical records

Defendant relied solely on the opinions of its hired doctors, who reviewed Plaintiff's medical files and never met her. Plaintiff argues that Defendant abused its discretion by failing to obtain a field visit, occupational review, or independent medical examination ("IME"). Plaintiff points to the 2005 "Multistate Agreement" Defendant entered into with insurance regulators, in which it agreed it would obtain an IME or Functional Capacity Evaluation in appropriate circumstances. Defendant counters that its decision to forgo an IME was reasonable. Because Plaintiff did not file her claim for LTD until September of 2016, Defendant argues that any IME after that point would not be helpful to determine whether Defendant abused its discretion in denying Plaintiff benefits after April 6, 2015. Defendant suggests that even if Plaintiff has

disabling symptoms that began after April 6, 2015, such symptoms would not compel a finding that she was disabled as of April 6, 2015. Def.'s Mot. Summ. J., 7.

The Court agrees with Defendant. A plan administrator is not required to examine the claimant. *Kushner v. Lehigh Cement Co.,* 572 F.Supp.2d 1182, 1192 (C.D. Cal. 2008) ("ERISA also does not require that an insurer seek independent medical examinations."). Instead, the decision not to seek an IME is one factor that courts consider when determining if a plan administrator abused its discretion. *See Salomaa,* 642 F.3d at 676 ("An insurance company may choose to avoid an independent medical examination because of the risk that the physicians it employs may conclude that the claimant is entitled to benefits. The skepticism we are required to apply because of the plan's conflict of interests requires us to consider this possibility in this case."); *see also Montour,* 588 F.3d at 630 ("Other factors that frequently arise in the ERISA context include . . . whether the plan administrator subjected the claimant to an in-person medical evaluation or relied instead on a paper review of the claimant's existing medical records.").

In this case, Plaintiff did not file her claim for LTD benefits until nearly year three years after the alleged onset of disability. Therefore, the Court is persuaded by Defendant's argument that the value of an IME was diminished, as it would not provide an assessment of Plaintiff's limitations at the time of the disability onset (or as of April 6, 2015). At most, it would help Defendant determine her limitations in the time frame in and around whenever the IME was obtained, which necessarily would have been no earlier than September of 2016.

The Court does not suggest that the timing of a claimant's claim, standing alone, is determinative of whether an insurer should seek an IME. It is, however, easier to see how an IME would help the insurer determine a claimant's limitations when it could take place closer to the time of the alleged onset of disability. *See, e.g., Roberston v. Standard Insurance Company*,

139 F. Supp. 3d 1190, 1194 (D. Or. 2015) (finding a failure to conduct an IME to weigh in favor

of finding an abuse of discretion when the claimant filed for disability benefits 12 days after she

stopped working); *Petrusich,* 984 F. Supp. 2d at 1122-23 (same when Plaintiff submitted claim

22 days after her alleged disability). Therefore, Defendant's failure to seek an IME does not

heighten the Court's skepticism of Defendant's decision to deny benefits after April 6, 2015.

    f.    <u>Inconsistent reasons for denial; self-dealing and failure to credit Plaintiff's credible evidence; failure to adequately investigate Plaintiff's claim</u>

Although the insured carries the burden of showing she is entitled to benefits, ERISA

administrators have a fiduciary duty to conduct an adequate investigation when considering a

claim for benefits. *Cady v. Hartford Life & Accidental Ins. Co.,* 930 F. Supp. 2d 1216, 1226 (D.

Idaho 2013) (citing *Booton v. Lockheed Med. Ben. Plan,* 110 F.3d 1461, 1463 (9th Cir. 1997));

*see also Rasenack v. AIG Life Ins. Co.,* 585 F.3d 1311, 1324 (10th Cir. 2009). "This requires that

the plan administrator engage in 'meaningful dialogue' with the beneficiary. If the administrator

'believes more information is needed to make a reasoned decision, they must ask for

it.'" *Cady,* 930 F. Supp. 2d at 1226 (quoting *Booton,* 110 F.3d at 1463). A plan administrator

may not "shut [its] eyes to readily available information when the evidence in the record

suggests that the information might confirm the beneficiary's theory of entitlement." *Rodgers v.

Metropolitan Life Ins. Co.,* 655 F. Supp. 2d 1081, 1087 (N.D. Cal. 2009) (citing *Gaither v. Aetna

Life Ins. Co.,* 388 F.3d 759, 773 (10th Cir. 2004)).

After a careful review of the parties' briefs, the Court finds that these factors do not

weigh in favor of a heightened scrutiny of Defendant's decision. As to the specifics, it is more

appropriate to discuss the remaining factors cited by Plaintiff in the merits discussion of the

Opinion, as they cannot be separated from Plaintiff's overall arguments regarding Defendant's

abuse of discretion. Thus, the parties' arguments are incorporated into the Court's overall decision on the merits of the case below.

In sum, the factors weighing in favor of a heightened level of scrutiny of whether Defendant abused its discretion are Defendant's structural conflict and its procedural violation of Plaintiff's right to a full and fair review. Taken together, the Court concludes that it is appropriate to apply the abuse of discretion standard of review with moderate scrutiny. *See Torres v. Reliance Standard Life Ins. Co.*, 319 F. App'x 602, 603 (9th Cir. 2009) (affirming the application of an abuse of discretion standard of review with a "moderate level" of scrutiny where the insurer committed a procedural error in denying benefits); *see also Peterson v. Fed. Express Corp. Long Term Disability Plan*, No. CV-05-1622-PHX-NVW, 2007 WL 1624644, at *1 (D. Ariz. June 4, 2007) ((applying moderate level of scrutiny to the defendant benefit plan's decision to deny benefits when the court concluded the decision contained procedural irregularities).

## III.   Merits

Defendant denied Plaintiff's claim for LTD benefits after April 6, 2015 because it concluded that, after that point, she was able to perform the duties of her occupation as an attorney and no longer met the definition of disability in Defendant's policies. Defendant did not abuse its discretion.

If an administrator's decision has a rational basis, the court may not substitute its judgment for that of the administrator when determining eligibility for plan benefits even if the court disagrees with the administrator's decision. *Torres v. Reliance Standard Life Ins. Co.*, 551 F. Supp. 2d 1221, 1233 (D. Or. 2008), *rev'd on other grounds*, 319 F. App'x 602 (9th Cir. 2009). "Under the abuse-of-discretion standard, the court's inquiry is not into whose interpretation of

the evidence is most persuasive, but whether the plan administrator's interpretation is unreasonable." *Id.* (internal quotation marks and citation omitted). *"*[T]he focus of an abuse of discretion inquiry is the administrator's analysis of the administrative record—it is not an inquiry into the underlying facts." *Id.* (internal quotation marks and citation omitted).

Plaintiff argues that Defendant abused its discretion because it ignored evidence in its files that Plaintiff was unable to perform all the material and substantial duties of her regular occupation on April 6, 2015. Plaintiff argues that Defendant failed to explain its bases for disagreeing with her treating physicians, had no reason for dismissing the treating physicians' opinions, and failed to address each of the physical and cognitive requirements of Plaintiff's occupation. Defendant responds that Plaintiff failed to prove an inability to perform the material duties of her occupation and that Defendant adequately considered her treating physician's conclusions and explained its reasons for disagreeing with some of those conclusions.

The crux of this case centers on the sufficiency of the medical evidence on or around April 6, 2015, the date on which Defendant determined Plaintiff no longer established she was disabled under the Plan. There is a relative absence of records around this date, as compared to the extensive documentation of Plaintiff's conditions before and after. This absence of records,[7] combined with the fact that records after her surgery suggest that it was successful, causes Plaintiff problems in sustaining her burden to show disability.

---

[7] Plaintiff also argues that Defendant failed to meet its obligation to request complete medical files from Plaintiff's physicians. Pl.'s Resp. Def. Mot. Summ. J. 18. While it is unclear what records Plaintiff contends Defendant did not receive or consider, it appears to the Court that even if there was a disagreement about what records were needed from Dr. Henderson, ultimately all records were requested, received, and included in the administrative record. AR 847-926. As to the failure to obtain complete records from Dr. Kreiling, Defendant detailed its efforts to obtain the records and Dr. Zimmerman incorporated the absence of some records into her analysis. AR 2136.

As described above, Plaintiff had surgery on October 6, 2014. She was seen by various treatment providers in November of 2014 and January of 2015, including Drs. Henderson and Pocinki. On January 5, 2015, Dr. Henderson noted that Plaintiff was doing well after her surgery and her cognitive issues had largely resolved, although she was experiencing increased pain. AR 237. The next day, Dr. Pocinki similarly opined that Plaintiff's cognitive function was much better after the surgery but her physical pain was worse. AR 1356-59. Plaintiff was next seen on March 2, 2015 by Dr. Hinz, who wrote that she was recovering well although disabled. SR 52. On May 11, 2015, Plaintiff had a CT scan that showed "post-operative changes and minimal degenerative changes. Post-operative C-spine imaging showed stability at C1/2." AR 2148.

Then, Plaintiff was not seen again until August 11, 2015, at which point Dr. Hinz noted that she had slowly increased her physical activity, was working with a physical therapist, and was still experiencing pain. SR 43. Plaintiff saw a gastroenterologist on August 14, 2015 and then was treated through the fall of 2015 and through February of 2016 for chronic pain management. AR 286-296; SR 142-146. On July 12, 2016, NP Kanakia wrote a letter regarding Plaintiff, in which she stated that Plaintiff continues to suffer from multiple symptoms that prevent her from working, "particularly as an attorney." AR 291. NP Kanakia saw Plaintiff again for medical refills on August 22, 2016. SR 151.

On September 1, 2016, Plaintiff filed her claim for LTD benefits. There is an increase in medical evidence for Plaintiff beginning in the summer and fall of 2016 to the present. However, because Plaintiff's claim was not filed until September 1, 2016, there was no opportunity for an IME or other evaluation of Plaintiff by Defendant in the nearly three years from the date of alleged disability. And while the Supplemental Record submitted by Plaintiff provided some new

medical evidence, it did not clarify Plaintiff's limitations in the months following her surgery and around April 6, 2015.

Plaintiff argues that because she did not have notice of April 6, 2015 as the date on which her benefits would be terminated, she had "no way to invite her doctors to address her condition on that date." Pl.'s Resp. Def.'s Mot. Summ. J., 34-35, ECF 59. But Plaintiff filed her claim on September 1, 2016, alleging she was disabled at least through that date. Thus, she bore the burden when filing her claim to establish disability beginning on the alleged onset date and including April 6, 2015, up to the time of the claim.

a. Physical limitations

Defendant reasonably concluded that Plaintiff was not physically precluded from performing the material duties of her occupation after April 6, 2015. When Dr. Dunn reviewed the MRI results, he found that the surgery had stabilized Plaintiff's cervical spine. Therefore, he estimated that her post-surgery recovery period would have likely ended within 6 months of the surgery, which was consistent with Dr. Henderson's pre-surgical estimate of a possible recovery time. AR 860, 1650. After reviewing the MRI and medical records, he concluded that Plaintiff's craniocervical and atlantoaxial stability had been addressed and she had no lingering cervical spine related issues that would preclude her from the physical demands of her occupation. AR 1650. He also opined that the notes of Drs. Henderson, Besha, and Davidson did not provide consistent supporting information that prevented Plaintiff from performing the physical requirements of her position. AR 1640.

When Plaintiff was examined by Drs. Henderson and Pocinki in January of 2015, following her surgery, they both noted her experience of pain and fatigue. AR 237, 1356. Their notes were based entirely on Plaintiff's reports of her pain. The doctors did not impose

limitations or restrictions on her ability to work and neither physician evaluated her condition for the next 18 months. When Dr. Henderson wrote a letter to NP Kanakia on November 29, 2016 after seeing Plaintiff, he wrote that she had "excellent relief of her symptoms" since her surgery, "until recently." SR 33.

Defendant reasonably relied on the review by Dr. Norris, a family medicine specialist. He reviewed medical records and evidence and did not find the diagnostic imaging, physical examinations, or reports of pain precluded sedentary work. Dr. Norris conducted another records review after Plaintiff supplemented the record and reached the same conclusion. AR 2146.

Plaintiff vigorously argues that the records demonstrate she was unable to perform the material duties of her occupation. However, most of the records she cites are from at least a year and a half after April 6, 2015, if not longer. For example, as to her physical limitations, she cites a letter from Dr. Pocinki that states that Plaintiff is unable to exert up to 10 pounds of force for 2.5 hours each day and that she is not capable of prolonged sitting. Pl.'s Mot. Summ. J., 25 (citing AR 984). But this letter was written on November 6, 2016 and says nothing about Plaintiff's abilities in 2015 or how her surgery impacted her limitations, if at all. It also does not refer to diagnostic findings and relies solely on Plaintiff's reports of her limitations. Plaintiff also points to Dr. Pocinki's December 2014 certification to Mass Mutual, in which he opined that Plaintiff would likely not be able to perform sedentary work until one year from her surgery. AR 1540. But when Dr. Pocinki examined Plaintiff a few weeks later, in January of 2015, he did not impose this limitation.  AR 1356, 1359.

The Court agrees with Plaintiff that it would be reasonable to infer that the limitations on her ability to work in November of 2016 were related and perhaps the same as the limitations she experienced in April of 2015. But Defendant's interpretation of the evidence is equally

reasonable. Given the estimated recovery time from the surgery, the lack of any limitations in the medical evidence until NP Kanakia's July 2016 note, and the CT scan and MRI findings, it is reasonable for Defendant to conclude that Plaintiff was no longer disabled under the Plan as of April 6, 2015. To the extent any treatment providers opined that Plaintiff was "disabled," they do not impose any occupational limitations or restrictions on or around April 6, 2015. Because this Court's role is to determine whether Defendant abused its discretion, not whether Plaintiff's interpretation is reasonable, the Court must uphold Defendant's decision.

    b.  <u>Cognitive limitations</u>

Defendant's conclusions as to Plaintiff's cognitive limitations are also reasonable. The only neuropsychological testing that took place prior to Defendant's Final Decision was conducted by Plaintiff's neuropsychologist, Dr. Besha, in January of 2014. Plaintiff's treating physicians noted that her cognitive issues largely resolved after the October 2014 surgery. They did not recommend or request any further neurocognitive testing, and none was performed until 2017.

In June 1, 2017, Dr. Kreiling reviewed Dr. Besha's report and disagreed with her conclusion that Plaintiff had "sufficient cognitive resources to function productively." AR 1546-47. Dr. Kreiling concluded that Plaintiff would have had difficulty functioning as an attorney in January of 2014. AR 1548. Dr. Kreiling's letter does not impose limitations or conclusions of Plaintiff's ability after that date. Then, when Dr. Kreiling performed her own tests in November of 2017, she was clear that those results reflected Plaintiff's abilities at that time. Therefore, those tests also do not shed light on Plaintiff's cognitive abilities in April of 2015.

Dr. Zimmerman reviewed both Dr. Besha's data and report, as well as Dr. Kreiling's review of Dr. Besha's data, and concluded that they did not support cognitive impairments.

Defendant also noted the chart notes after Plaintiff's surgery, which stated that Plaintiff's cognitive complaints had largely resolved. AR 1753. Dr. Zimmerman conducted a second records review, which incorporated Plaintiff's supplemental materials, on November 16, 2018. AR 2131. She concluded that some of Plaintiff's reports of her medical and cognitive symptom history to Dr. Kreiling were inconsistent with her medical records. AR 2132. In addition, she noted that "[t]he records from providers in the previous two years reflected her symptoms progressed from occasional confusion in 12/15 to chronic multiple cognitive complaints." AR 2134. As to Dr. Kreiling's neuropsychological evaluation, she wrote that the results, "if valid and reliable for interpretation, were likely influenced by transient and/or acute somatic factors and did not accurate represent the cognitive sequelae of a static and/or progressive neurologic condition 2.5 years after benefits end on 4/6/15." AR 2135.

Plaintiff relies on NP Kanakia's evaluation in July of 2016, Dr. Pocinki's November 2016 letter, and Dr. Henderson's chart notes from October 2016, which suggest that Plaintiff's cognitive impairments precluded her from performing the material duties of her occupation. However, Defendant reasonably disregarded those conclusions as unsupported by the objective test results and not indicative of Plaintiff's abilities around April of 2015.

Based on the marked improvement in Plaintiff's cognitive abilities after her surgery and the lack of medical evidence to suggest a change by April 6, 2015, it was reasonable for Defendant to conclude that Plaintiff did not meet her burden of showing disability based on cognitive impairments.

c. Driving

Plaintiff argues that Defendant ignored medical evidence in the record establishing Plaintiff's inability to drive as of April of 2015. Because Defendant's vocational resource

indicated that a restriction of "no driving" would interfere with the performance of the material and substantial duties of the occupation of associate attorney, AR 1751, Plaintiff argues that this precludes denying her benefits.

The issue of whether Plaintiff can drive is another example of the ways in which the record can be interpreted in conflicting, yet reasonable, ways. The Administrative Record contains the following references to Plaintiff's inability to drive:

- 9/2015 – Dr. Brandt: noting that Plaintiff was not driving (AR 1387)

- 7/12/16 – NP Kanakia: Plaintiff is "unable to drive an automobile." (AR 1393)

- 8/22/16 – NP Kanakia: "Patient does not drive." (SR 152)

- 10/11/6 – Dr. Pocinki: Plaintiff can "drive locally and do short errands." (AR 1422)

- 1/24/17 – Physical therapy note: Driving is a "severe problem" where symptoms disrupt driving in less than 15 minutes. (SR 67)

- 4/17/17 – Dr. Hinz: Plaintiff wears a neck brace with driving. (SR 34)

- 6/5/17 – Plaintiff's response to questionnaire: "I cannot drive my car or travel as long as I want because of moderate symptoms." (SR 128)

- 6/6/17 – Declaration of Plaintiff's fiancée: The only time Plaintiff drove from November 2013 until 2016 was the day she went to Dr. Besha's appointment. She had no choice but to drive. Because it was "extremely stressful" and it was apparent that she could not drive safely, she did not attempt to drive again until "sometime in 2016." (AR 1457)

- 11/11/17 – Dr. Kreiling neuropsychological evaluation: She "is only able to drive for short periods" and "does not like to drive because she does not believe she can fully attend to all the things she needs to do when she is driving."

Plaintiff argues that this evidence establishes that Plaintiff was unable to drive until at least October of 2016. Apart from when Plaintiff drove to Dr. Besha's appointment, there is no evidence that she drove from the date of her disability until sometime in 2016.

However, Defendant argues that the fact that Plaintiff reported a lack of driving or an inability to drive is different than having those limitations placed on her by medical

professionals. In addition, the only record from 2015 states that Plaintiff was "not driving," not that she was unable to drive. *See* AR 1387. The first record stating that she is unable to drive is in July of 2016, over a year after the date on which Defendant has determined Plaintiff was no longer disabled. While the record is not precise as to when Plaintiff began driving locally or for short periods, it appears that it occurred in 2016. However, the lack of evidence that she was precluded from driving throughout 2015 means that Plaintiff has failed to meet her burden on this limitation. Therefore, it was reasonable for Defendant to conclude that she could perform the material duties of her occupation, including driving, as of April 6, 2015.

    d.  <u>Summary</u>

Even if the court disagrees with the ultimate decision, deference must be given to the administrator unless it is clearly unreasonable. While there may be evidence supporting Plaintiff's claim of disability, she fails to establish that she was disabled on or about April 6, 2015 and thereafter. To the extent the record suggests that Plaintiff is disabled at some point in 2016 or 2017, the Court finds that any such disability it is too attenuated from the established pre-April 6, 2015 period of disability to infer that her conditions continuously existed to the same extent in the months and years after April 6, 2015.  Based on the record, therefore, Defendant's decision is not illogical, implausible, or without support from the record. Defendant did not abuse its discretion.

///

///

**CONCLUSION**

The Court DENIES Plaintiff's Motion for Summary Judgment [54] and GRANTS

Defendant's Motion for Summary Judgment [56]. The Court grants Plaintiff's Motion to Strike

[52].

IT IS SO ORDERED.

Dated this _____ 29 _____ day of _____ April _____, 2019.


_____
MARCO A. HERNÁNDEZ
United States District Judge