IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

ALISON GARY, an individual                    No. 3:17-cv-01414-HZ

              Plaintiff,                    OPINION & ORDER

    v.

UNUM LIFE INSURANCE COMPANY
OF AMERICA, a Maine Corporation, as
administrator of the Dickstein Shapiro LLP
Group Long Term Disability Plan,

              Defendant.

Arden J. Olson
HARRANG LONG GARY RUDNICK, PC
497 Oakway Road, Suite 380
Eugene, Oregon 97401

      Attorney for Plaintiff

Robert B. Miller
KILMER VOORHEES & LAURICK, PC
2701 NW Vaughn Street, Suite 780
Portland, Oregon 97210

      Attorney for Defendant

HERNÁNDEZ, District Judge:

This case comes before the Court on remand from the Ninth Circuit Court of Appeals. Plaintiff, Alison Gary, brought claims under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001-1461 ("ERISA"), contending that Defendant, Unum Life Insurance Company of America, wrongfully denied her application for long-term disability ("LTD") benefits. The Court previously applied a moderate level of skepticism to its abuse of discretion review of Defendant's denial of Plaintiff's benefits and granted summary judgment in favor of Defendant, concluding that Defendant did not abuse its discretion in denying benefits after April 6, 2015. *Gary v. Unum Life Ins. Co. of Am.*, 388 F. Supp. 3d 1254, 1284 (D. Or. 2019). Plaintiff appealed, and the Ninth Circuit reversed and remanded with instructions for the district court to apply a "heightened level of skepticism in determining whether [Defendant] abused its discretion." *Gary v. Unum Life Ins. Co. of Am.*, 831 Fed. Appx. 812, 814 (9th Cir. 2020). Plaintiff now seeks an order granting partial summary judgment on remand on her first claim for relief for benefits under 29 U.S.C. § 1132(a)(1)(B). First Am. Compl. ("FAC") 11-12. After applying a heightened level of skepticism and weighing all the relevant factors, the Court concludes that Defendant abused its discretion in denying Plaintiff's claim for LTD benefits after April 6, 2015. Accordingly, Plaintiff's Partial Motion for Summary Judgment is granted.

## BACKGROUND

### I.    Factual Background

In September 2012, Plaintiff began working as an associate attorney at a law firm. FAC ¶ 5. The law firm had two LTD program plans: one with Massachusetts Mutual Life Insurance

Company ("Mass Mutual")[1] and one with Defendant. *Id.* ¶ 11. It is undisputed that Defendant

found Plaintiff disabled from September 27, 2013, through April 6, 2015. AR 1747.[2]

     A.     Plaintiff's Medical Condition before April 6, 2015

    Plaintiff has Ehlers-Danlos syndrome ("EDS") Type III. AR 95. EDS is an incurable

disorder, and Plaintiff previously experienced joint issues related to EDS. AR 52, 229. In

November 2013, Plaintiff began having issues with her cognition that affected her work, so she

sought medical treatment. AR 229.

    Plaintiff saw Dr. Alan Pocinki, an EDS and joint mobility expert in November 2013. AR

81, 1463-66. Dr. Pocinki noted that Plaintiff's "multiple signs [and] symptoms [with] EDS

suggest[ed a] craniocervical problem," and he ordered an MRI of Plaintiff's cervical spine. AR

81. After reviewing the MRI scan, Dr. Pocinki diagnosed Plaintiff with cervicomedullary

syndrome. AR 43-45, 93, 230. Cervicomedullary syndrome is "a condition where pressure on the

brain stem causes numerous and varied neurological, including in [Plaintiff's] case cognitive

problems, weakness, impaired coordination, bladder problems, numbness, tingling, and other

sensory disturbances." AR 230. Dr. Pocinki ordered Plaintiff to stop working immediately, AR

45, and Plaintiff stopped working the next business day on December 1, 2013. AR 230.

    In January 2014, Plaintiff saw Dr. Xi Besha for a neuropsychological evaluation. AR

215. Dr. Besha reported that Plaintiff "was somewhat slow" on a test of simple psychomotor

speed and "showed significant difficulty with sustained attention (impaired) and inhibitory

control." AR 217. Overall, Dr. Besha noted that Plaintiff "performed well" on the

---

[1] Mass Mutual approved Plaintiff's LTD claim. AR 1460-61; FAC ¶ 11.
[2] Citations to "AR" are to the Administrative Record. ECF 34.

neuropsychological evaluation, "with most scores falling in the superior to average range,

suggesting that [Plaintiff] has sufficient cognitive resources to function productively." *Id.*

Plaintiff saw Dr. Fraser Henderson, a neurosurgeon, in February 2014. AR 68. Dr.

Henderson noted the appearance of "C1/2 instability syndrome in the setting of Ehlers-Danlos

syndrome," given that Plaintiff suffered from "severe neck pain that is relieved with a neck

brace, headaches, cognitive changes, word-finding issues, . . . weakness, sensory loss,

hyperreflexia, and imbalance." *Id.*

Although Plaintiff continued multiple treatment measures with both Dr. Henderson and

Dr. Pocinki for about a year, Dr. Henderson eventually recommended surgery. AR 859. In an

August 2014 visit, Dr. Henderson stressed that the surgery would "not offer a panacea for all her

problems," and that the surgery, even if successful, would only "take care of some of her issues."

AR 860. Dr. Henderson also noted that following surgery, recovery could take "six months for

normal activation of the muscle and return to normal neck function." *Id.*

On October 6, 2014, Plaintiff underwent "suboccipital decompression, reduction, and

occipitoaxial fusion-stabilization" surgery. AR 254-57. The surgery mainly involved a fusion of

Plaintiff's C1 and C2 vertebrae. AR 255-56. In an operative report, Dr. Henderson noted that

Plaintiff understood that "because of the EDS, there would be a number of symptoms that remain

and may progress even after surgery despite a successful surgical procedure." AR 255.

Following her surgery, Plaintiff continued to see multiple health providers and specialists

for recovery and treatment for the symptoms related to her EDS. In the week after the surgery,

Dr. Henderson noted that Plaintiff had "done extraordinarily well" and that she was standing

"straighter," "taller," and she felt like "her brain fog [was] clearing." AR 239. Plaintiff was seen

on January 5, 2015, and January 6, 2015, by Dr. Henderson and Dr. Pocinki respectively. AR

237, 258, 1356. Both doctors noted that Plaintiff's cognitive function was improved since her surgery but that her joint pain still persisted. AR 237, 1356. Dr. Hinz reported that Plaintiff's recovery would likely take between 12 to 18 months. AR 258.

On March 9, 2015, Dr. William Hinz saw Plaintiff. SR 50-52.[3] Dr. Hinz noted that Plaintiff was "currently disabled," and that she "may be able to return to her law profession in a year or two." SR 50, 52.

B.    Plaintiff's Medical Condition after April 6, 2015[4]

On May 11, 2015, Plaintiff had a cervical spine CT scan that revealed that the fusion of Plaintiff's two vertebrae "appear[ed] intact" and that "[n]o other significant degenerative changes" or "other radiographic abnormalities of the cervical spine" were identified. SR 48.

On July 7, 2015, Dr. Pocinki spoke with a doctor from Mass Mutual about Plaintiff's recovery. SR 12. Dr. Pocinki noted that with physical therapy, it "might take over a year" for Plaintiff's dislocations to improve as her muscle tone improved. SR 13. In the summer of 2015 through February 2016, Plaintiff continued with treatment, physical therapy, and chronic pain management with various medical professionals. SR 43; AR 280, 286, 291-96.

On July 12, 2016, Plaintiff saw Nurse Practitioner ("NP") Meera Kanakia, who wrote a letter concerning Plaintiff's condition. AR 291. NP Kanakia noted that Dr. Henderson had not yet cleared Plaintiff to return to work in light of her cervicomedullary syndrome, and NP Kanakia explained that Plaintiff continued to suffer from multiple symptoms that prevented her from working as an attorney. AR 291. In August 2016, Plaintiff saw NP Kanakia again, who

---

[3] Citations to "SR" are to the Supplemental Record. ECF 48, 49.
[4] Plaintiff's medical history was also recounted in depth in the Court's April 29, 2019, Opinion and Order ("April 2019 O&O"). *See Gary*, 388 F. Supp. at 1264-69.

noted that Plaintiff hoped to start part-time work in October once Dr. Henderson cleared Plaintiff for work. SR 154.

      In October 2016, Plaintiff saw both Dr. Henderson and Dr. Pocinki. Dr. Henderson reported that Plaintiff still had some memory, concentration, and reflex issues. AR 853. Plaintiff also had muscle spasms, urinary difficulties, shoulder and neck pain, muscle cramping, and a feeling of instability in her neck. AR 853. Consequently, Dr. Henderson ordered another MRI for Plaintiff. AR 853-54. Dr. Pocinki reported that while Plaintiff's neurological problems were better overall, she experienced persistent pain, fatigue, and spasms. AR 1421. Dr. Pocinki further noted that Plaintiff had to wear a hard neck brace to tolerate more than 15 minutes of sitting and, even then, she could only tolerate 90 minutes total. AR 1422.

      In November 2016, Dr. Pocinki wrote a letter to Defendant in response to a request for additional information about Plaintiff. AR 982. Dr. Pocinki opined that, contrary to Defendant's doctor's conclusions, Plaintiff was unable to perform either the physical or cognitive demands of her job as an attorney. AR 984-85. Additionally, Dr. Pocinki reported to Mass Mutual that Plaintiff's expected date to return to work was "unknown" and that Plaintiff could not "sustain physical or cognitive activity for more than a few short periods a day." SR 10-11.

      Dr. Henderson reviewed the results of Plaintiff's MRI in November 2016 and noted that Plaintiff was "three years status post C1/2 fusion and stabilization for atlantoaxial instability with excellent relief of her symptoms, that is until recently." SR 33. Dr. Henderson wrote that Plaintiff was "now having some memory issues, concentration issues, hyperreflexia, muscle spasms, and urinary difficulties" but that there was "no evidence of craniocervical instability." SR 33.

Plaintiff continued to receive treatment through the end of 2016 into 2017. SR 32-37, 165, 167. On September 2, 2017, Dr. Pocinki provided a letter to Plaintiff's attorney after examining Plaintiff the day before. SR 1. Dr. Pocinki wrote that he was "disappointed to see that, although she reported her overall condition as stable, it certainly was no better than when [he] had seen her a year ago." *Id.* He described Plaintiff's significant cognitive and physical limitations, including maintaining conversation; reading and writing; ability to sit for prolonged periods of time; and ability to exert up to 10 pounds of force. SR 2.

On November 11, 2017, Dr. Kreiling performed a neuropsychological evaluation of Plaintiff. SR 55. Dr. Kreiling concluded that Plaintiff could not perform the material and substantial cognitive duties required of an attorney, including performing a variety of duties involving frequent changes in tasks without losing her composure or efficiency. SR 55.

## II.    The Plan

As noted above, Plaintiff was enrolled in a LTD plan ("Plan") with Defendant. The Plan defines "disability" as:

> You are disabled when Unum determines that due to your sickness or injury:
>
> 1. You are unable to perform the material and substantial duties of your regular occupation and are not working in your regular occupation or any other occupation or,
>
> 2. You are unable to perform one or more of the material and substantial duties of your regular occupation, and you have a 20% or more loss in your indexed monthly earnings while working in your regular occupation or in any occupation.
>
> You must be under the regular care of a physician in order to be disabled.
>
> The loss of a professional or occupational license or certification does not, in itself, constitute disability.

AR 401.

### III.    Procedural Background

On September 1, 2016, Plaintiff filed a claim for LTD benefits with Defendant. AR 228-33. Plaintiff sought benefits from November 27, 2013, through September 1, 2016. AR 228. On February 24, 2017, Defendant denied Plaintiff's claim. AR 1747. Plaintiff filed her administrative appeal on June 12, 2017. AR 1747. Defendant responded on July 26, 2017, ("Final Decision"), concluding that Plaintiff was disabled from November 27, 2013, through April 6, 2015. AR 1746-56. Defendant found that after April 6, 2015, Plaintiff had recovered from surgery and "other conditions, including EDS, no longer precluded [Plaintiff] from performing the sedentary demands required by [her] regular occupation." AR 1753.

In September 2017, Plaintiff filed this action, asserting three claims for relief. Compl., ECF 1; FAC 11-14. Plaintiff sought (1) an award of benefits pursuant to 29 U.S.C. § 1132(a)(1)(B); (2) continued and retroactive disability payments under federal common law pursuant to 29 U.S.C. § 1133; and (3) a declaration as to future benefits under 29 U.S.C. § 1132(a)(1)(B). FAC 11-14. In March 2018, the Court granted in part and denied in part summary judgment in favor of Plaintiff on her second claim for relief. Opinion & Order 2, ECF 29. In January 2019, the parties submitted cross motions for summary judgment on Plaintiff's first and third claims for relief. *See* ECF 54, 56.

On April 29, 2019, the Court denied Plaintiff's Motion for Summary Judgment and granted Defendant's Motion for Summary Judgment on Plaintiff's remaining claims. *Gary*, 385 F. Supp. 3d at 1284. In denying Plaintiff's motion, the Court applied an abuse of discretion standard of review with a moderate level of skepticism. *Id.* at 1279. The Court concluded that Defendant's structural conflict and procedural violation of Plaintiff's right to a full and fair

review were the only factors that weighed in favor of a heightened level of scrutiny in evaluating whether Defendant abused its discretion in denying Plaintiff's claim. *Id.*

On the merits, the Court concluded that Defendant did not abuse its discretion in denying Plaintiff's claim for LTD benefits after April 6, 2015. *Id.* The court recognized that there was a rational basis for Defendant's denial of benefits because Plaintiff failed to present sufficient medical evidence of her disability—such as her physical, cognitive, or driving limitations—on or around April 6, 2015. *Id.* at 1284. As such, the Court concluded that, given the deference owed to Defendant under the appropriate standard of review with moderate skepticism, Defendant's decision was "not illogical, implausible, or without support from the record." *Id.*

Plaintiff subsequently appealed. On appeal, the Ninth Circuit concluded that the district court "applied the incorrect level of skepticism to its abuse-of-discretion review" and reversed and remanded with instructions. *Gary*, 831 Fed. Appx. at 814. The Ninth Circuit concluded that the district court erred by (1) "expressly merging the conflict of interest evidence and merits claims," and (2) "failing to view the evidence in the light most favorable to [Plaintiff]." *Id.* at 813. Consequently, the Ninth Circuit concluded that "the conflict evidence support[ed] a higher degree of skepticism than the moderate degree [that was] applied," given that (1) Defendant's consultants "cherry-picked" certain observations from medical records; (2) Defendant did not hire an EDS specialist to access Plaintiff's claim; (3) Defendant did not conduct its own in-person medical examination ("IME") of Plaintiff; and (4) Defendant initially denied Plaintiff's claim outright and then reversed its previous decision, finding that Plaintiff was disabled from November 27, 2013, through April 6, 2015. *Id.* at 814.

Thus, the Ninth Circuit has instructed the district court to "apply the appropriate, heightened level of skepticism in determining whether [Defendant] abused its discretion" on

remand. *Id.* On remand, Plaintiff has filed a Partial Motion for Summary Judgment on her first

claim for relief. Pl. Mot. Partial Summ. J. Remand ("Pl. Mot. Summ. J."), ECF 82.

## STANDARDS

Traditionally, summary judgment is appropriate if there is no genuine dispute as to any

material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P.

56(a). However,

> [t]raditional summary judgment principles have limited application in ERISA cases
> governed by the abuse of discretion standard. Where, as here, the abuse of
> discretion standard applies in an ERISA benefits denial case, a motion for summary
> judgment is, in most respects, merely the conduit to bring the legal question before
> the district court and the usual tests of summary judgment, such as whether a
> genuine dispute of material fact exists, do not apply.

*Stephan v. Unum Life Ins. Co. of Am.*, 697 F.3d 917, 929-30 (9th Cir. 2012) (citations and

quotation marks omitted). In addition, "judicial review of benefits determinations is limited to

the administrative record—that is, the record upon which the plan administrator relied in making

its benefits decision[.]" *Id.* at 930 (internal quotation marks omitted). "[W]hen a court must

decide how much weight to give a conflict of interest under the abuse of discretion standard[,] . .

. the court may consider evidence outside the [administrative] record." *Abatie v. Alta Health &*

*Life Ins. Co.*, 458 F.3d 955, 970 (9th Cir. 2006) (en banc). In considering "evidence outside the

administrative record to decide the nature, extent, and effect on the decision-making process of

any conflict of interest[,]" *id.*, traditional rules of summary judgment apply, and "summary

judgment may only be granted if after viewing the evidence in the light most favorable to the

non-moving party, there are no genuine issues of material fact." *Stephan*, 697 F.3d at 930

(internal quotation marks omitted). "[T]he decision on the merits, though, must rest on the

administrative record once the conflict (if any) has been established, by extrinsic evidence or

otherwise." *Abatie*, 458 F.3d at 970.

## DISCUSSION

Plaintiff argues that, under a heightened level of skepticism, Defendant's denial of her claim constituted an abuse of discretion. Pl. Mot. Summ. J. 22. Plaintiff contends that Defendant abused its discretion because (1) there was no relative absence of evidence of Plaintiff's condition around April 2015, and (2) medical records demonstrate that Plaintiff was disabled and unable to perform both the physical and cognitive demands of her occupation as a lawyer as of April 2015 and thereafter. *Id.* at 22-38. Defendant responds that even under a heightened level of scrutiny, Defendant's denial of Plaintiff's claim should be upheld because its decision was not "clearly unreasonable." Def. Resp. Opp'n Pl. Mot. Partial Summ. J. ("Resp. Mot. Summ. J.") 1, ECF 83 (citing *Stephan*, 697 F.3d at 929).

The Court concludes that Defendant abused its discretion in denying Plaintiff's claim for LTD benefits after April 6, 2015. After applying a heightened level of skepticism in reviewing Defendant's decision, the factors that weigh in favor of finding an abuse of discretion include: Defendant's structural conflict of interest; the conflicting opinions between Plaintiff's treating physicians and Defendant's reviewing physicians; Defendant's decision not to conduct an IME; Defendant's failure to hire an EDS specialist; and Defendant's acts of "cherry-picking" medical evidence. Accordingly, Plaintiff's motion is granted.

## I.    Standard of Review in This Matter

In reviewing for abuse of discretion, an ERISA plan decision "will not be disturbed if reasonable." *Conkright v. Frommert*, 559 U.S. 506, 521 (2010) (internal quotation marks omitted). This reasonableness standard requires deference to the administrator's benefits decision unless it is "(1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts on the record." *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 676

(9th Cir. 2011) (internal quotation marks omitted); *see also Tapley v. Locals*, 728 F.3d 1134, 1139 (9th Cir. 2013) (explaining that the court "equate[s] the abuse of discretion standard with arbitrary and capricious review"). Under this standard, Defendant's interpretation of the plan language "is entitled to a high level of deference and will not be disturbed unless it is not grounded on any reasonable basis." *Tapley*, 728 F.3d at 1139 (internal quotation marks omitted).

However, "the court should adjust the level of skepticism with which it reviews a potentially biased plan administrator's explanation for its decision in accordance with the facts and circumstances of the case." *Abatie*, 458 F.3d at 969. As noted above, the Ninth Circuit has remanded this case and instructed the Court to apply a "heightened level of skepticism" in determining whether Defendant abused its discretion. *Gary*, 831 Fed. Appx. at 814. Contrary to Defendant's assertions otherwise, Resp. Mot. Summ. J. 3-20, the Ninth Circuit has clearly instructed this Court to apply a "heightened level of skepticism," so the Court is not tasked with determining the level of skepticism on remand.

In determining whether an abuse of discretion has occurred, the Court must consider numerous case-specific factors and weigh and balance those factors together, including "the administrator's conflict of interest." *Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d 623, 630 (9th Cir. 2009). Because the "facts and circumstances indicate the conflict may have tainted the entire administrative decision-making process, the court should review the administrator's stated bases for its decision with enhanced skepticism: this is functionally equivalent to assigning greater weight to the conflict of interest as a factor in the overall analysis of whether an abuse of discretion occurred." *Id.* at 631. In reviewing Defendant's decision with heightened skepticism, "[s]imply construing the terms of the underlying plan and scanning the record for medical evidence supporting [Defendant's] decision is not enough." *Id.* at 630.

**II.      Defendant's Denial of Plaintiff's Claim**

A.      Relative Absence of Evidence of Plaintiff's Condition Around April 6, 2015

Plaintiff maintains that there was no relative absence of evidence concerning her condition on and around April 2015. Pl. Mot. Summ. J. 23. Moreover, she asserts that Defendant's conclusion that she should have recovered from surgery within six months was unreasonable. *Id.* at 29-30. Defendant responds that a "gap in records establishing restrictions and limitations after April 6, 2015[,] is consistent with [Plaintiff's] medical providers' records." Resp. Mot. Summ. J. 25. The Court finds that (1) Defendant's reliance on April 6, 2015, as the date that Plaintiff recovered from surgery was unreasonable as it was unsupported by the record; and (2) Defendant's reliance on any absence of records on or around April 6, 2015, was unreasonable under the Plan, which only required that Plaintiff demonstrate that she was under the regular care of a physician.

i.      April 6, 2015, Recovery Date

Before Plaintiff's surgery, Dr. Henderson estimated that "the results may take six months for normal activation of the muscle and return to normal neck function." AR 860. In denying Plaintiff's claim, Defendant concluded that Plaintiff "was disabled from Nov[ember] 27, 2013, through April 6, 2015." AR 1753. Defendant's physician stated that, given Plaintiff's surgery in October 2014, "a six[-]month recovery period is reasonable. This extends through April 6, 2015." AR 1750. Defendant explained that, "[b]ased on the MRI scan in October 2016, and the clivo-axial angles, [Defendant's] orthosurgeon does not support restrictions or limitations beyond April 6, 2015." AR 1750. Moreover, Defendant has clarified that in selecting the six-month April 6, 2015, recovery date, it "agreed with Dr. Henderson's estimate for a [six]-month

recovery from surgery and found her totally disabled through that recovery period." Resp. Mot. Summ. J. 26.

Defendant's reliance on Dr. Henderson's six-month recovery estimate before Plaintiff's surgery was unreasonable given the overwhelming post-surgical medical evidence that anticipated a longer recovery. In concluding that Plaintiff did not have any "restrictions or limitations beyond April 6, 2015," Defendant only cited to an MRI scan from October 2016. AR 1750. In relying on the April 6, 2015, date, Defendant ignored evidence from various medical providers who had determined, when they examined Plaintiff after her surgery, that her recovery exceeded six months.

In December 2014, Dr. Pocinki provided a statement to Mass Mutual estimating that Plaintiff could return to work one-year after surgery in October 2015. AR 1540. Dr. Pocinki further noted that the extent and scope of her return to work "depend[ed] on the speed [and] extent of her recovery." AR 1540.

In January 2015, Plaintiff saw Dr. Pocinki again. AR 258. He observed that while Plaintiff presented "dramatic improvement in cognitive symptoms," she experienced "consistent fatigue," "lots of spasms in neck, shoulders, even chest," that her "knee was very painful," and that "overall pain [was] worse." AR 258. Importantly, he noted that he and Plaintiff had "[d]iscussed [her] long-term prognosis," and that "to rebuild tone, stabilize lax joints, [and] restore energy reserves," her recovery "likely will take another 12-18 months." AR 258.

In March 2015, Plaintiff saw Dr. Hinz for a rheumatology consultation. SR 50. Dr. Hinz stated that following Plaintiff's surgery, she was "recovering well and may be able to return to her law profession in a year or [two]," SR 50. Dr. Hinz further instructed Plaintiff to follow-up in

four months to review her symptoms and further discuss her long-term plan. SR 53. Plaintiff

followed Dr. Hinz's instruction and followed-up in August 2015. SR 43.

 In July 2015, nine months after surgery, Dr. Pocinki spoke with a doctor from Mass

Mutual about Plaintiff's recovery. SR 12. In that conversation, Dr. Pocinki explained that while

Plaintiff's "dislocations would gradually improve as muscle tone improved with physical

therapy," Dr. Pocinki "anticipated that this might take over a year." SR 13.

 In May 2016,[5] Plaintiff saw NP Kanakia. SR 147. NP Kanakia observed that Plaintiff was

"having difficulty with fatigue and attention span," and that she had "been seeing neurology and

[physical therapy] for chronic neck/back pain." SR 147. Further, NP Kanakia noted Plaintiff's

"2[-]year recovery from surgery" and that Plaintiff intended to meet with Dr. Henderson "to start

part time work after [her recovery] if cleared by him." SR 147.

 Two months later, in July 2016, NP Kanakia wrote a letter that detailed Plaintiff's condition

and recovery at that time:

> Since September 2015, [Plaintiff] has been a patient of mine. Our intention is that,
> upon receiving word from her neurosurgeon Dr. Henderson that her neck instability
> and cervicomedullary syndrome have stabilized, we will reevaluate her ability to
> return to some kind of work.
>
> Certainly, however, [Plaintiff] continues to suffer from multiple symptoms that
> prevent her from working, particularly as an attorney. She experiences intractable
> muscle spasms in her neck and shoulders, pain, fatigue, dizziness, and nausea. She
> is unable to drive an automobile. She has to lay down at various unpredictable times
> throughout the day due to her symptoms. She continues to have impairment of
> reflexes and balance, demonstrated by her most recent evaluation provided by
> Micah Bates, PA-C in our neurosurgery spine clinic. She also requires medication
> that would impair her work performance.
>
> [Plaintiff] continues to work on her rehabilitation which has been recommended by
> her current provider.

---

[5] In the fall of 2015 through February 2016, Plaintiff continued with physical therapy and
treatment for chronic pain management. AR 286, 292-95, 1945.

AR 291.

In August 2016, Plaintiff saw NP Kanakia again. SR 154. NP Kanakia noted Plaintiff's "difficulty with fatigue and attention span," and reported that Plaintiff "hopes to start part time work in October once cleared by her neurosurgeon." SR 154.

In October 2016, Plaintiff had an MRI. AR 853-84. She also visited with Dr. Pocinki, who noted that Plaintiff's neurological problems were better but that there was "still some weakness." AR 1421. Dr. Pocinki stated that Plaintiff "[h]as to wear a hard collar to sit at [a] desk for more than 15 minutes," and that "[w]ith it she can only tolerate 90 min[utes]." AR 1421-22. In November 2016, Dr. Henderson reviewed Plaintiff's MRI and noted that there was "no evidence of craniocervical instability." SR 33.

In sum, despite Dr. Henderson's pre-surgical estimate of Plaintiff's possible recovery time, Defendant ignored evidence from numerous medical professionals who had treated Plaintiff after surgery and found that her recovery exceeded six months. Moreover, Plaintiff did not have her first post-surgery CT scan until May 2015, which was a month after Defendant concluded that Plaintiff had recovered from surgery. SR 48. Defendant's failure to consider the numerous post-surgical medical opinions—especially in light of the Court's heightened skepticism—weighs in favor of an abuse of discretion.

ii.     Whether Plaintiff was in the Regular Care of a Physician

Given that Defendant erred in relying on the estimated April 6, 2015, date that Plaintiff could have recovered from surgery, Defendant's reliance on any supposed absence of records on or immediately after April 6, 2015, was unreasonable, especially in light of the Plan's requirements. The Plan does not require a set frequency of medical visits to establish a long-term disability. *See* AR 401-02. Rather, the Plan requires a showing that one is "under the regular care of a physician in order to be disabled." AR 401. To be disabled under the Plan, one must be

"unable to perform the material and substantial duties of one's regular occupation and are not working in [one's] regular occupation or any other occupation." *Id.* Accordingly, as Plaintiff correctly points out, the Plan did not require Plaintiff to see a treating doctor with a particular frequency to be considered disabled. *See* Pl. Mot. Summ. J. 25.

Thus, although Plaintiff did not see a doctor on April 6, 2015, Defendant's reliance on any supposed absence of records does not demonstrate that Plaintiff was not under "the regular care" of a physician. Plaintiff only sought treatment when it was appropriate to do so based on recommendations and her own treatment needs. Notably, one month before April 2015, Plaintiff saw Dr. Hinz. SR 50-54. At that evaluation, Dr. Hinz noted that—based on her condition and recovery—Plaintiff could return to work in a year or two. SR 50. He further instructed Plaintiff to return for a follow-up visit approximately four months later, and Plaintiff did. SR 53, 43. In viewing Defendant's denial with heightened skepticism given the record as a whole, the Court is persuaded that Defendant did not reasonably rely on any "gap" in medical records on or immediately after April 6, 2015, to conclude that Plaintiff was not disabled under the Plan.

      B.      Whether Defendant had a Reasonable Basis to Conclude that Plaintiff was not Disabled after April 6, 2015

Plaintiff further argues that the medical records demonstrate that she was disabled from April 6, 2015, onward, so Defendant had no reasonable basis to conclude that she was not disabled. Pl. Mot. Summ. J. 25-36. Plaintiff contends that, when examining Defendant's decision with a heightened level of skepticism, the medical records demonstrate that Defendant had no reasonable basis to find that Plaintiff could perform the physical or cognitive demands of her job as an attorney. *Id.* at 25-36. Defendant responds that Plaintiff does not present any new evidence that the Court did not already consider in its April 2019 O&O when applying a moderate level of

skepticism, and Plaintiff did not present sufficient evidence of any restrictions or limitations that prevented her from performing the physical and cognitive demands of her job after April 6, 2015. Resp. Mot. Summ. J. 23-29.

The Court has already found that Defendant unreasonably concluded that Plaintiff recovered from surgery for her cervicomedullary and atlantoaxial instability on April 6, 2015. Accordingly, the Court now considers whether Defendant abused its discretion in concluding that Plaintiff's other medical conditions precluded Plaintiff from performing the physical and cognitive duties of her job as an attorney after April 6, 2015.

After reviewing Defendant's decision with heightened skepticism, the Court finds that Defendant did not reasonably conclude that Plaintiff was capable of performing her material duties, given that (1) Defendant did not perform an IME of Plaintiff, (2) Defendant did not hire any EDS specialists to perform a "paper review" of her file, and (3) the denial was not sufficiently supported by medical evidence in the record given that Defendant "cherry-picked" evidence. Thus, all three factors weigh in favor of finding that Defendant abused its discretion.

        i.     Physical Demands and Defendant's Final Decision

Plaintiff's job as an attorney involved sedentary work, which, according to Defendant's Plan, required the physical demands of

> [e]xerting up to 10 pounds of force occasionally [up to 2.5 hours in an 8-hour work day] and/or a negligible amount of force to lift, carry, push, pull, or otherwise move objects, including the human body. Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time.

AR 446.

In concluding that Plaintiff could perform the physical requirements of her job after April 6, 2015, Defendant hired physicians to perform a paper review of Plaintiff's medical file. AR 1747, 1751. Defendant's physician concluded that "overall, the clinical records do not support

restrictions or limitations that would preclude performing sedentary activities, as required by

[Plaintiff's] occupation." AR 1751. Defendant concluded that Plaintiff could perform the

physical demands of her job after April 6, 2015, based on "[t]he examination findings, diagnostic

testing and imaging, intensity and frequency of treatment, and [her] activities." AR 1752.

### ii.    Cognitive Demands and Defendant's Final Decision

The cognitive demands of Plaintiff's job included "[d]irecting, [c]ontrolling, or

[p]lanning activities for others;" "[i]nfluencing [p]eople in their [o]pinions, [a]ttitudes, [and

j]udgments;" "frequent changes of tasks involving different . . . working conditions, physical

demands, or degrees of attentiveness without loss of efficiency or composure;" and "solving

problems, making evaluations, or reaching conclusions." AR 446.

In concluding that Plaintiff could perform the cognitive requirements of her job,

Defendant had its neuropsychologist conduct a paper review of the medical record. AR 1752.

Defendant's neuropsychologist summarized Dr. Besha's findings and concluded that "the score

data did not support a credible decline in [Plaintiffs] cognitive abilities." AR 1752. Additionally,

Defendant's neuropsychologist disagreed with Dr. Kreiling's report, and its neuropsychologist

noted that Dr. Henderson "indicated that [Plaintiff's] cognitive complaints markedly improved

by June 2014 . . . and that within a few months after the October 2014 surgery, many of

[Plaintiff's] cognitive complaints had resolved." AR 1753.

### iii.    Defendant's Failure to Conduct an IME or hire an EDS specialist

It is undisputed that Defendant did not perform an IME of Plaintiff. Instead, Defendant

hired consultants to perform a paper review of Plaintiff's medical records to assess her claims.

Although a plan administrator is not required to independently examine a claimant, "one factor

that the courts consider when determining if a plan administrator abused its discretion,

particularly in cases where the administrator has a conflict of interest, is whether the plan administrator conducted only a paper review of the claimant's file." *Robertson v. Standard Ins. Co.*, 139 F. Supp. 3d 1190, 1204 (D. Or. 2015); *see Montour* 588 F.3d at 630 ("Other factors that frequently arise in the ERISA context include . . . whether the plan administrator subjected the claimant to an in-person medical evaluation or relied on a paper review of the claimant's existing medical records."). Plan administrators are not required to conduct IMEs, but "[t]here are . . . circumstances under which a plan administrator *should* conduct an IME." *Petrusich v. Unum Life Ins. Co.*, 984 F. Supp. 2d 1112, 1123 (D. Or. 2013) (emphasis in original). Simply put, although the Plan does not require Defendant to conduct an IME of Plaintiff, "that choice raises questions about the thoroughness and accuracy of the benefits determination." *Montour*, 588 F.3d at 634 (internal quotations and citations omitted).

Further, Defendant "only hired consultants specializing in orthopedic surgery, family medicine, and psychology to assess [Plaintiff's] claim—*not* an EDS specialist." *Gary*, 831 Fed. Appx. at 814 (emphasis in original). The Ninth Circuit has recognized that an administrator's decision not to consult specialists with expertise in a claimant's condition can demonstrate an administrator's abuse of discretion—especially when the administrator fails to examine the plaintiff independently. *See Zavora v. Paul Revere Life Ins. Co.*, 145 F.3d 1118, 1122-23 (9th Cir. 1998) (concluding that a plan administrator abused its discretion in relying on its own "medical personnel, none of whom the record shows to have been an ophthalmologist" when the plan administrator also did not examine the plaintiff independently); *Kunin v. Benefit Trust Life Ins. Co.*, 910 F.2d 534, 538 (9th Cir. 1990) (concluding that a plan administrator's denial of benefits was arbitrary and capricious when "the doctors with whom the [plan administrator]

consulted" did not have "any significant experience with or particular expertise concerning" the plaintiff's condition).

It is undisputed that Plaintiff has EDS with hypermobility. It is also undisputed that Defendant did not conduct an IME of Plaintiff. Further, the Ninth Circuit in this case observed "the uniqueness of EDS" when considering Defendant's choice not to conduct its own IME of Plaintiff when determining the appropriate level of skepticism. *Gary*, 831 Fed. Appx. at 814. EDS is an incurable disease. SR 52 ("[T]here is no intervention for Ehlers-Danlos."). In concluding that Plaintiff was not disabled after April 6, 2015, Defendant rejected the medical opinions of her treating physicians—which included EDS specialists—in favor of Defendant's reviewing physicians who (1) were not EDS specialists and (2) did not personally examine Plaintiff. As such, in light of the "uniqueness" of EDS, the Court finds that Defendant's failure to obtain an IME of Plaintiff and hire an EDS specialist to review the medical records are two factors that both weigh in favor of an abuse of discretion.

iv.    Defendant's Cherry-Picking of Medical Evidence

Defendant rejected the conclusions of Plaintiff's medical providers without any sufficient evidentiary basis for doing so. As the Ninth Circuit in this case recognized, "[Defendant's] consultants cherry-picked certain observations from medical records numerous times." *Gary*, 831 Fed. Appx. at 814. Importantly, a "plan administrator may not 'shut [its] eyes to readily available information when the evidence in the record suggests that the information might confirm the beneficiary's theory of entitlement.'" *Robertson*, 139 F. Supp. 3d at 1204 (quoting *Rodgers v. Metropolitan Life Ins. Co.*, 655 F. Supp. 2d 1081, 1087 (N.D. Cal. 2009)). The cherry-picking of certain observations from the record—coupled with the factors discussed above—also weighs in favor of finding an abuse of discretion.

For example, in the same August 2014 pre-surgical report that estimated that Plaintiff could recover from surgery in six months, Dr. Henderson also noted that Plaintiff's "surgery does not offer a panacea for all of [Plaintiff's] problems. It takes care of this one problem and will take care of some of her issues." AR 860. As noted above, Plaintiff saw a variety of medical professionals throughout the summer of 2015 through the fall of 2016 for consultations, physical therapy, and chronic pain management. *See* SR 43 (seeing Dr. Hinz in August 2015); AR 286 (seeing Dr. Brandt in September 2015); AR 292-96 (seeing NP Kanakia in November 2015); SR 142-46 (seeing NP Kanakia in February 2016); SR 147 (seeing NP Kanakia in May 2016); SR 151 (seeing NP Kanakia in August 2016). Notably, in October 2016, Plaintiff visited Dr. Pocinki. AR 1421. He noted that Plaintiff was "probably capable of 4-5 hours of light activity with frequent long breaks" and that she could only tolerate sitting at a desk for 90 minutes while wearing a neck brace. AR 1421-22. In November 2016, Dr. Pocinki wrote a letter explaining that, since 2013 through the time of writing the letter, Plaintiff was continuously disabled and unable to perform either the physical or cognitive demands of her job. AR 1550-53.

Regarding Plaintiff's cognitive abilities, Defendant also cherry-picked evidence to support its ultimate conclusion. In April 2014, Dr. Pocinki wrote a letter to Defendant, noting that given the "extent of Plaintiff's physical and cognitive impairments," Plaintiff's limitations were "wholly incompatible with [Plaintiff's] employment as an attorney." AR 299. And Dr. Pocinki's November 2016 letter explained that his previous findings regarding Plaintiff's inability to work as an attorney remained unchanged throughout that time period. AR 1550-53. In May 2016, NP Kanakia noted Plaintiff's "difficulty with fatigue and attention span." AR 1950. Two months later, in July 2016, NP Kanakia reported that Dr. Henderson had not yet cleared Plaintiff to work following her surgery, and that "[Plaintiff] *continues to* suffer from

multiple symptoms that prevent her from working, particularly as an attorney." AR 291 (emphasis added). In October 2016, Dr. Henderson reported Plaintiff having "some memory issues … and some concentration and some reflex issues." AR 853-54.

Moreover, Dr. Besha's report did not indicate whether Plaintiff had the cognitive abilities to work specifically as an attorney. AR 217. Rather, Dr. Besha noted that Plaintiff had "sufficient cognitive resources to function productively." *Id.* Dr. Kreiling's report, however, analyzed Dr. Besha's data to consider whether Plaintiff had the cognitive demands to function as an attorney. AR 1546-48. And, as Dr. Kreiling concluded, Plaintiff did not have the cognitive demands to function as an attorney in January 2014 based on that data. AR 217. Defendant summarily rejected Dr. Kreiling's conclusion. *See* AR 1753 ("[O]ur neuropsychologist does not agree with Dr. Kreiling's conclusions.").

In light of Defendant's structural conflict of interest, the conflicting opinions between Plaintiff's treating physicians and Defendant's reviewing physicians, Defendant's decision not to conduct an IME, Defendant's failure to hire an EDS specialist to review the medical record, and Defendant's cherry-picking of medical evidence from the record, the Court concludes that Defendant's interpretation of the relevant medical evidence was unreasonable. Accordingly, Defendant abused its discretion in denying Plaintiff's LTD benefits after April 6, 2015.

## CONCLUSION

The Court GRANTS Plaintiff's Partial Motion for Summary Judgment [82] and orders judgment in favor of Plaintiff for payment of benefits. Plaintiff shall prepare an appropriate Judgment consistent with this Opinion and, after conferring with Defendant, submit an agreed form of Judgment to the Court for signature within 10 days of the date below.

IT IS SO ORDERED.

DATED:__November 29, 2021____.


_____
MARCO A. HERNÁNDEZ
United States District Judge